**MARVEL ENTERTAINMENT GROUP, INC. and Marvel Productions, Ltd., Plaintiffs,**

v.

**YOUNG ASTRONAUT COUNCIL and Young Astronaut Management Corporation, Defendants.**

**No. 88 Civ. 5141 (RLC).**

United States District Court, S.D. New York.

Aug. 1, 1990.

**946**

Trief & Olk, New York City (Ted Trief, Barbara E. Olk, of counsel), for plaintiffs.

Bass & Ullman, New York City (Alfred Ferrer, III, of counsel), for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff Marvel Entertainment Group is a Delaware corporation with its principal place of business in New York City. It is a major publisher and distributor of comic books, and markets and licenses its own and third-party trademarks and copyrights. Co-plaintiff Marvel Productions Ltd., a Delaware corporation with its principal place of business in Van Nuys, California, is a major producer of animated television shows. Plaintiffs hereafter will be collectively referred to as "Marvel".

Defendant Young Astronaut Council (the "Council") is a not-for-profit corporation organized under the laws of the District of Columbia with its principal place of business in Washington, D.C. It was created in 1984 with the objective of encouraging American children to study math and science by using the United States space program as a catalyst. Co-defendant Young Astronaut Management Corporation is a for-profit corporation wholly owned by the Council and organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C. Its purpose is to raise revenue to fund the Council's programs. Defendants hereafter will be collectively referred to as "YAC".

## FACTS

In 1984, Marvel and YAC entered into an agreement whereby Marvel was given the sole and exclusive right to use YAC's name, logo and trademarks to create, design, publish and sell comic books, magazines and related publications (the "Publishing Agreement"). While the Publishing Agreement did not require a certain number of publications, if, after 1988, Marvel had not published at least six books or paid YAC certain minimum royalties, YAC was entitled to terminate it.

Subsequently in 1984, a second agreement was entered into by the parties which authorized Marvel to act as YAC's exclusive representative to arrange and negotiate licensing agreements for the commercial use of YAC's names, logos and trademarks and any YAC related creations of Marvel (the "Merchandising Agreement"). For its efforts, Marvel was to receive a yearly set fee plus 10% of any profits.

In 1985, the parties entered into an agreement whereby Marvel was given the exclusive right to make and produce animated television shows based on YAC's name, related names, logo and trademarks (the "T.V. Agreement"). Under this agreement, Marvel was to receive a fee calculated as a percentage of the license fee and a percentage of the net profits.

In March, 1986, YAC decided it wanted to terminate its relationship with Marvel. Discussions and negotiations to that end proceeded, and on June 30, 1986, the parties signed a so-called Modification Agreement in Washington, D.C. Under this agreement, the T.V. and the Merchandising Agreements were terminated; Marvel's exclusive agency was terminated and YAC received back the rights to its name, logos, trademarks, characters and symbols; and Marvel's royalty rate for licenses purchased by McDonald's was modified. The Modification Agreement provided that the parties would list all licensing agreements and pending agreements entered into between YAC and any licensee, and all such agreements and pending agreements entered into between Marvel and any licensee. In addition, the parties agreed to set forth all monies received pursuant to such agreements from whatever source. It was warranted that these listings covered all licensing agreements and revenues derived therefrom, as well as all pending agreements. The Publishing Agreement was not affected.

Marvel instituted this action in July, 1988, to recover payments allegedly due under the Modification Agreement. On October 27, 1989, in an opinion with which familiarity is presumed, the court granted Marvel partial summary judgment in the amount of $75,000 based on YAC's obligation to make fixed compensation payments as required by paragraph 5 of the Modification Agreement. See, No. 88 Civ. 5141 (RLC), slip op. at 17–18, 1989 WL 129504 (S.D.N.Y. Oct. 27, 1989). Neither Marvel's other claims for breach of the Modification Agreement, nor YAC's counterclaims for breaches of the Publishing, Merchandising and T.V. Agreements could be resolved by summary judgment. Accordingly, these matters were brought to trial before the court on April 17–19, 1990.

At trial, Marvel sought to establish that YAC failed to account for all monies due Marvel or for monies received by YAC from McDonald's, Pepsi, Coleco and Quaker. There was no disagreement as to the amounts received from each of these four accounts, and it is also undisputed that YAC did not list the disputed sums in the Modification Agreement. YAC contends, however, that these sums were not required to be listed in the Modification Agreement and that nothing is due Marvel from these accounts. YAC further claims that Pepsi was not a licensee and that Marvel knew about the Pepsi contributions in any event; that the payments from Coleco post-dated the Modification Agreement and, that although it did receive funds on the day the Modification Agreement was signed, it was an advance on an agreement with Coleco which was to become operative subsequently; that the Quaker account which was terminated with a payment $40,-000 would have generated $250,000 to $500,000 but for Marvel's dilatory conduct in contract negotiations, and; that nothing is due from the funds received from McDonald's because Marvel failed to produce the promised television show.

## DETERMINATION

■ The threshold issue is whether the Modification Agreement constituted a settlement of the parties' earlier agreements. In its motion for summary judgment, Marvel asked the court to construe the Modification Agreement as a settlement and release with respect to the Merchandising and T.V. Agreements. This the court declined to do at that time because the available facts were conflicting. See, No. 88 Civ. 5141 (RLC), slip op. at 15–17 (S.D.N.Y. Oct. 27, 1989). These conflicts were resolved at trial with the testimony of Joseph Calamari, executive vice president of Marvel, and Wendell Butler, president of YAC, who both stated that it was the intent of the parties that the Modification Agreement settle their prior relationship. In the words of Butler, the Modification Agreement was a settlement "with respect to existing relationships" involving YAC, Marvel and third parties. Transcript at 432.

■ "New York law requires that a release contain an 'explicit, unequivocal statement of a present promise to release defendant from liability.'" *Bank of America National Trust & Savings Assoc. v.*

*Gillaizeau,* 766 F.2d 709, 713 (2d Cir.1985). The parties' intent will determine the scope of the release, *id.,* and no particular form or language is required to manifest a release. *Pratt Plumbing and Heating, Inc. v. Mastropole,* 68 A.D.2d 973, 414 N.Y.S.2d 783, 784 (3d Dep't. 1979). If ambiguities in the document prevent a firm conclusion that it is a release, additional evidence may be considered to resolve the issue. *Bank of America, supra,* 766 F.2d at 714. Whether a document is a release is a factual question and therefore extrinsic evidence and oral testimony may be considered. *Id.*

■ Paragraph 4 of the Modification Agreement explicitly terminates the Merchandising and T.V. Agreements and provides that neither Marvel nor YAC shall have any further obligations under either contract. Although there is no statement that the Modification Agreement is a settlement, compromise or release of prior claims under the two terminating agreements, the principals involved in negotiating it testified that they intended it to be a settlement. The primary function of the court in interpreting a contract is to effect the parties' purpose in coming to terms. *Cromwell Towers Redevelopment Co. v. Yonkers,* 41 N.Y.2d 1, 6, 390 N.Y.S.2d 822, 826, 359 N.E.2d 333, 337 (1976) ("[a] fair and reasonable interpretation, consistent with [the parties'] purpose, must guide the courts in enforcing the agreement"); *New York Bank for Savings v. Howard Cortlandt St. Inc.,* 106 A.D.2d 496, 498, 482 N.Y.S.2d 836, 838 (2d Dep't. 1984) ("[i]n construing a contract, a focal point of inquiry must be the objective of the contract and the purposes of the parties").

The Modification Agreement was meant to settle whatever disagreements existed under the Merchandising and T.V. Agreements, with the new agreement governing the winding down of the relationship. While the Publishing Agreement was not affected by the Modification Agreement, all claims under the Merchandising and T.V. Agreements predating June 30, 1986, were rendered inoperative and unenforceable when the Modification Agreement was executed. Accordingly, YAC's counterclaims based on Marvel's breach of the T.V. or Merchandising Agreements are dismissed.

The status of the Modification Agreement having been resolved, the next issue is the determination of Marvel's share of the money received by YAC. Exhibit 6 of the Modification Agreement seeks to categorize and define what funds received under the various agreements are or are not subject to inclusion in YAC's gross revenue for calculation of Marvel's fee. In-kind contributions, non-cash gifts or services, and contributions where the donor has been given no right to use YAC's property in the sale or exploitation of any product or service are not subject to inclusion in calculating Marvel's fee. Conversely, where money was received and the donor was granted the right to use YAC's name, logo or trademark in connection with the sale or promotion of any product, Marvel would be entitled to a percentage fee. Where the sale or promotion involved a Marvel creation, Marvel's share was to be 57%. Regarding the McDonald's account, it was agreed that 25% of the proceeds derived from the first "Happy Meal" promotion was to go to Marvel and 75% was to go to YAC. In all other cases, Marvel was to receive 10%. It is undisputed that YAC received $695,933 from McDonald's, of which Marvel seeks $129,593.30; $519,541 from Pepsi, of which Marvel claims $51,-954.10; $429,537 from Coleco, of which Marvel claims $42,953.70 as its rightful share; and $40,000 from Quaker, of which Marvel seeks $4,000.

Marvel introduced McDonald's to YAC and, in 1985, the parties contracted for McDonald's to feature a "Young Astronaut Happy Meal" during September–October, 1986, with options to continue the promotion through 1988. This contract, plaintiffs' exhibit 52, provides in paragraph 7 that this license could be extended to other areas, including preparation of materials to assist teachers in the identification and structuring of special classroom experiences in conjunction with YAC's mailings of its standard classroom materials.

■ YAC's arguments that Marvel is not entitled to its fee from the proceeds YAC

obtained from McDonald's are confused and without merit. Its primary defense is that Marvel induced McDonald's to enter into the agreement by promising a television show which Marvel not only failed to deliver, but even failed to notify McDonald's that CBS would not produce the show once it had that information.

The testimony at trial showed that Marvel paid YAC $150,000 to exercise its option to sell its rights for an animated television show to a major network. CBS ordered 13 episodes for airing in the fall of 1985, and Marvel produced an outline of the entire concept for the show (called a bible in the trade), produced the storyboard and scripts, began the process of animation and commenced developing the first show. The expected expenditure for the 13 episodes was $3,000,000, but Marvel spent over $1,200,000 on the first show alone.

YAC's primary concern was that the show be scientifically credible, while CBS, which had the ultimate authority of approval, wanted the show to be entertaining. The demands of the consultant who monitored the project to protect YAC's interest in scientific accuracy apparently rendered the show dull and not saleable in CBS' view. Because of this, the show was postponed by CBS from the fall projected airing, although it was not cancelled. Eventually, YAC restrained the consultant and gave Marvel the freedom to go ahead with CBS' plans, and there was a meeting with CBS, Marvel and YAC in January, 1986, to discuss the show. The day after this meeting the space shuttle exploded and CBS notified the parties that the show was being cancelled.

These facts do not warrant placing the onus for the failure to have a television show produced on Marvel. Marvel did not, and could not, have guaranteed the production of a television show by a major network. It could only provide assurance that it would use its best efforts to sell such a product to a network, which it did. The evidence at trial indicated that YAC must take some responsibility for the failure of the show to be produced. Perhaps if YAC had removed some of its consultant's authority earlier, some of the proposed 13 episodes might have been produced before the space shuttle accident. In any event, the failure to get the television show produced cannot afford YAC any basis for withholding Marvel's fee.

YAC received two payments totalling $400,000 for the first Happy Meal promotion. Marvel is entitled to 25% of those funds for a total of $100,000. YAC received $195,933 for the second Happy Meal promotion, and two payments of $50,000 for a curriculum package showing space related occupations or careers for the future. These materials were authorized under paragraph 7 of the 1985 contract. While this curriculum package was not a direct promotion of McDonald's, it provided an economic benefit to the company in that the children involved with the material would see the association of McDonald's with YAC and they would become more interested in McDonald's and more inclined to visit and involve themselves in McDonald's Happy Meal promotion. Accordingly, Marvel is entitled to 10% of this $295,933.00 or $29,593.30, and thus, Marvel is due a total of $129,593.30 on the McDonald's contracts.

■ In the Modification Agreement, YAC listed receiving $25,000 cash and in-kind services from Pepsi, with no money due Marvel. YAC identified Pepsi on page 33 of the Modification Agreement as "involved in a number of projects, most significant of which is its lead role in the Young Astronaut Continuing Education Fund (a fund to provide incentive to students who will graduate from college with science or math degrees)."

YAC did not disclose that it had entered into an agreement with Pepsi on July 9, 1985, authorizing Pepsi to use its name, related names, logos and trademarks in its advertising and promotional efforts to promote awareness of YAC's program. The agreement states that it is "for promotional uses only" and that if a licensing agreement is desired, that must be contained in a separate written contract. Plaintiffs' exhibit 73. Under the agreement, Pepsi was designated the soft drink of YAC, and YAC

was guaranteed a minimum of $250,000 during the three-year term of the agreement. Through YAC's efforts, a can of Pepsi was placed aboard the Challenger, the space shuttle, with photographs of the event being used in nation-wide advertising. Furthermore, contrary to the representations in the Modification Agreement, YAC had received $353,208 from Pepsi as of the date the Modification Agreement was executed, June 30, 1986. Subsequent to signing the Modification Agreement, YAC was paid an additional $166,333 from Pepsi in four payments.

Butler testified that Marvel had knowledge of YAC's relationship with Pepsi prior to the signing of the Modification Agreement and that there had been a public announcement of Pepsi's guarantee of $250,000 for YAC. Calamari disclaimed knowledge of this, and there is no record to show that anyone at Marvel involved in the relationship between Marvel and YAC was aware of the nature of the arrangements between YAC and Pepsi. The evidence on this question is preponderantly, if not clearly and convincingly, to the effect that Marvel had no knowledge of YAC's relationship with Pepsi.

YAC was certainly not above board with Marvel about its relationship with Pepsi. Indeed, its posture, except when it could not do otherwise, was to hide the true nature of the relationship and conceal the extent of Pepsi's financial support. It is impossible to believe that YAC could have thought that it did not have to be forthcoming with Marvel about its involvement with Pepsi. Butler negotiated the Modification Agreement, which called for full disclosure, and therefore must have known of YAC's obligations. I can only conclude that there was a deliberate attempt to mislead Marvel as to the nature of the relationship with Pepsi and to withhold monies received. In any event, since the Modification Agreement in paragraph 3(c) expressly required defendants to set forth in Schedule 3(c)(ii) "a true and accurate accounting of the aggregate of all revenues derived" from whatever source and however categorized, the listing of only $25,000 plus in-kind services from Pepsi rather than the $353,208

actually in hand as of June 30, 1986, is a clear violation of the Modification Agreement.

YAC presses the view that the arrangement with Pepsi was nothing more than a corporate contribution to a non-profit organization. At the trial, Maurice Cox, director of public relations for Pepsi, called the initial $25,000 "seed money" to get the YAC program off the ground, emphasizing that YAC's educational goals and objectives were consistent with Pepsi's "corporate point of view." Transcript at 337. Cox described the funds from Pepsi as "distributions made to a non-profit organization" in the same way as a charitable contribution. Transcript at 347. Cox indicated that Pepsi made contributions to many non-profit enterprises, and named the United Negro College Fund and the Dance Theatre of Harlem as examples. He conceded, however, that Pepsi was not named the official drink of these organizations in return for receipt of Pepsi's largess.

In this case, Pepsi was not merely giving funds to a non-profit entity. Instead, it was securing a return by being designated the official soft drink of YAC, which was clearly intended to influence children in the YAC school programs to choose Pepsi as their soft drink. Pepsi was also authorized to use YAC property in its promotional efforts on behalf of the YAC program, a strategy which was intended to benefit Pepsi commercially by association of the Pepsi name with the YAC program.

Under the circumstances, I hold that the $519,541 from Pepsi is subject to Marvel's 10% fee allocation. Accordingly, Marvel is awarded a judgment of $51,954.10 on their Pepsi claim.

While the relationship with Marvel was still in effect, but when the parties were negotiating the terms of the Modification Agreement, YAC and Coleco were negotiating a licensing agreement to become effective when YAC's agreement with Marvel was terminated. YAC and Coleco signed this agreement, which was effective on July 1, 1986, the day after the execution of the Modification Agreement. On the very

day the Modification Agreement was effectuated, YAC received $275,000 from Coleco, described as an advance on the July 1st agreement.

■ Marvel accuses YAC of bad faith for negotiating with Coleco while its exclusive licensing agreement was still in effect. I do not believe the bad faith characterization is appropriate. Calamari and Butler had agreed that it was best for the parties to end their relationship and were in the process of negotiating the terms of their divorce. The discussion and agreement with Coleco simply recognized that YAC and Coleco would have an agreement which would post-date the termination of YAC's agreement with Marvel. In my view, YAC was not obligated to wait until the settlement was signed and sealed before it could discuss future relationships with third parties.

■ YAC should have listed the pending Coleco agreement on the Modification Agreement, as well as the $275,000 advance. Perhaps fearful that it would be required to share the Coleco funds with Marvel if the relationship was revealed, it failed to disclose this information. Although this is in violation of the Modification Agreement, it is not one entitling Marvel to share in the Coleco proceeds.

■ The contract between Quaker and YAC was initiated by Marvel, but because the contract negotiations were too protracted, a situation for which YAC blames Marvel, the relationship was broken off and Quaker paid YAC $40,000 in settlement. Since this money was paid on a licensing contract made while Marvel was YAC's exclusive agent, Marvel is entitled to its 10% fee. Accordingly, Marvel is awarded judgment in the amount of $4,000 on this issue.

Marvel is also entitled to its attorneys' fees pursuant to paragraph 8 of the Modification Agreement. In that paragraph, YAC agrees to indemnify Marvel against all claims, including attorney fees, arising out of a breach by YAC of "any representation, warranty or covenant" contained in the Modification Agreement. YAC clearly has been guilty of a number of such breaches as detailed in the above discussion of the McDonald's, Pepsi and Coleco issues.

Accordingly, Marvel is to present a detailed and specific memorandum to the court detailing the attorneys' fees claimed. YAC, on receipt of Marvel's memorandum, may submit opposition papers. Marvel's papers should be filed three weeks after the date the court's opinion is filed, and YAC's opposition papers should be filed two weeks after service of Marvel's papers.

I am somewhat confused as to whether there is a claim by YAC in re the Publishing Agreement. At any rate, even if Marvel breached this agreement by failing to publish the required six books, YAC's only recourse is termination of the agreement. Accordingly, if there is any claimed breach of this agreement, that claim is dismissed.

In sum, Marvel is awarded judgment in the total amount of $185,547.40, plus interest of 9% from June 30, 1986. This award is in addition to the $75,000 previously awarded to Marvel on its Motion for Summary Judgment. In addition, Marvel is entitled to attorneys' fees pursuant to paragraph 8 of the Modification Agreement, the amount of this award to await the indicated submissions by the parties.

IT IS SO ORDERED.