V.S. INTERNATIONAL, S.A. and Victorio Sanchez Lopez, Plaintiffs,

v.

**BOYDEN WORLD CORPORATION, Defendant.**

**No. 90 Civ. 4091 (PKL).**

United States District Court, S.D. New York.

Sept. 30, 1994.

Antonio M. Flores, New York City, for plaintiffs.

Lane & Mittendorf, New York City, (John LoBosco, David Santacroce, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge.

This is a breach of contract action arising out of a Licensing Agreement entered into between defendant Boyden World Corporation ("Boyden"), as licensor, and plaintiff V.S. International, S.A. ("V.S. International"), as licensee. The Licensing Agreement ("Agreement" or "Px. 2") was entered into in March or April of 1987, but was effective as of January 1, 1987. Trial Transcript ("Tr.") at 372. Plaintiff Victorio Sanchez Lopez ("Sanchez") was also a party to the Agreement, as President of V.S. International. Sanchez is referred to in the Agreement as the "Control Individual." A trial was held in this matter without a jury from September 27, 1993 to September 30, 1993. The Court has considered all the evidence presented, and the following constitutes this Court's findings of fact and conclusions of law, pursuant to Fed. R.Civ.P. 52(a).

## PROCEDURAL BACKGROUND

This Court has jurisdiction over this breach of contract action based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. The parties stipulated in the Agreement, Px. 2 at ¶ 23, and on the record in open Court, Tr. at 15, that the law of New York would apply to this action. Thus, the Court will apply New York law. *See Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 765 n. 1 (2d Cir.1986) ("Because of the choice of law clause, appellee's contract claims are governed by New York law."); *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 265 n. *, 401 N.Y.S.2d 176, 179 n. *, 372 N.E.2d 12, 15 n. * (1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored.").

In an Opinion and Order issued March 4, 1993, this Court granted partial summary judgment in defendant's favor, pursuant to Fed.R.Civ.P. 56, dismissing plaintiffs' third cause of action. However, the Court found there to be triable issues of fact and, accordingly, denied defendant's motion with respect to the issues of: (1) liability; (2) plaintiffs' claim for damages; and (3) defendant's counterclaims.

Prior to the start of trial, the Court denied plaintiffs' untimely request for a jury, which was first made in the pretrial order. Fed. R.Civ.P. 38.

## FINDINGS OF FACT

Plaintiff V.S. International is an executive search firm headquartered in Madrid Spain. Tr. 16. Plaintiff Sanchez is the president and founder of V.S. International. *Id.* at 14. Defendant Boyden is a Delaware Corporation, with offices in New York, which licenses its name "Boyden" to executive search firms worldwide, but does not itself engage in executive searches. *Id.* at 370.

In 1986, Boyden's relationship with its representative in Spain, Jean Bella, was terminated, and Boyden began to look for an individual to replace Bella and continue to run an executive search operation in Spain, using the Boyden name. *Id.* at 17–19, 380–384, 437–38. Three of Bella's former associates, Jose Montalar, Carlos Velilla, and Jaime Ferrer, expressed interest in continuing to operate their respective executive search businesses using the Boyden name, and suggested to Boyden that it begin an association with Sanchez, who, through V.S. International, was already engaged in the executive search business in Madrid. Sanchez discussed this possibility with Ferrer, and also discussed with Ferrer the possibility of forming an arrangement whereby either Sanchez, Velilla, or Montalar would secure a license from Boyden, so they could all continue to operate under the Boyden name. *Id.* at 17–19, 437–41.

After meeting with Boyden representatives, Sanchez, on behalf of himself and V.S. International, entered into a letter agreement with Boyden, effective April 15, 1986. *Id.* at 20–25. Pursuant to the letter agreement, V.S. International would be Boyden's representative office in Madrid and, assuming their relationship proceeded smoothly,

they would enter into a formal licensing agreement. Px 11.[1]

At its September 1986 Board of Directors meeting, the Boyden board decided to grant Sanchez a license for the Spanish territory and also decided to allow him to handle the internal questions regarding the offices and personnel within Spain. Tr. 99–102; Px. 13. The board's decision was formally communicated to Sanchez by way of a letter from Putney Westerfield ("Westerfield"), Boyden's president, dated September 26, 1986. Px. 14.

On November 10, 1986, Sanchez entered into a written agreement with Montalar and Velilla. This agreement, written by Sanchez and sent to the other two individuals, provided in relevant part:

[i]t is the intention of the signers to form or utilize a mercantile society whose actions would be property of its signers in equal parts/shares and whose presidency will be held initially by D. Victorio Sanchez Lopez, whose company will channel the relationship with Boyden Associates Corporation, it being the one who granted the mark for spain.

Px. 37 (translation), 37–A. The November 10 agreement also stated that Sanchez had no problem with Montalar and Veilla continuing to use the Boyden name and having their businesses revolve around this name. This agreement also provided that the financial terms would be the same as those which Boyden established for V.S. International. *Id.*[2]

The Licensing Agreement between V.S. International and Boyden was entered into in March or April of 1987, but was effective as of January 1, 1987, and dated accordingly. Tr. 372. Pursuant to the Agreement, defendant Boyden granted V.S. International the exclusive right, franchise, license and privilege of using the name "Boyden" and the symbols, methods and systems of operation of Boyden in connection with the operation of its executive recruiting business within Spain, from January 1, 1987 to December 31, 1989. Agreement, at ¶¶ 1–3. The Agree-

ment specifically stated that "[e]xcept as otherwise provided herein, the grant of such license within the Territory shall be exclusive." Agreement, at ¶ 1(a)(i). The Agreement reiterated the exclusivity of the license in a separate provision which defined the relevant "Territory" for the license:

Licensee shall have the exclusive right to operate its executive recruiting business and to use [the Boyden name] in Spain (the "Territory"), and to establish offices within the Territory, the location of which shall be subject to the prior written approval of Licensor, which approval shall not be unreasonably withheld. Licensor agrees that it will not grant a license to another licensee in the Territory.

*Id.* at ¶ 2(a).

In exchange for this licensing right, the Agreement provided for the payment of license fees, first due for the period July 1, 1987 through December 31, 1987. Agreement, at ¶ 6. The agreement also included a guarantee of the payment of such fees by plaintiff Sanchez. *Id.* at ¶ 17. While the initial term of the Agreement was three years, terminating on December 31, 1989, the Agreement also contained an automatic extension clause which provided that the Agreement would be automatically extended for successive periods of one year, unless 180 days prior to the expiration of the term, written notice of termination was made by one party to the other. *Id.* at ¶ 3(a). The termination clause of the Agreement required Boyden to issue a written warning to V.S. International at least six months before issuing the notice of termination, except in the case of default. *Id.* at ¶ 3(b). Termination of the Agreement by default could occur if one of the parties violated any of the terms provided in the Agreement, and failed to cure such a default within thirty (30) days after notice has been sent. Failure to pay the licensing fees would constitute such a default. Agreement, at ¶ 12.

---

1. While the letter agreement did not require plaintiffs to pay license fees, the licensing Agreement, discussed *infra*, which superseded the letter agreement, did require the payment of fees beginning July 1, 1987. Px. 2.

2. Velilla operated under this agreement until July 1, 1987, at which point V.S. International informed Westerfield that Velilla no longer represented Boyden. Px. 18.

After Boyden granted the license to V.S. International in January 1987, Montalar and Sanchez continued to work amicably in their respective regions of Spain under the Boyden name. Sanchez and Montalar entered into an additional letter agreement, dated January 7, 1988, which, conditioned on Boyden's approval, provided, *inter alia*, the following: (1) plaintiffs, as a licensee of Boyden Spain, authorized Montalar's business, Servicios de Search, S.A., to continue to use the name Boyden for business promotion under the same terms that Boyden applies to the rest of its members; (2) Servicios de Search, S.A., agreed to pay its share of the expenses termed "license fee" for which V.S. International was responsible to Boyden; and (3) both parties agree to work towards a mutual partnership. Px. 5; Dx O, (translation 0–1). Regarding this arrangement, Sanchez gave the following testimony before this Court: "I authorized Montalar to use the name Boyden ... only use the name Boyden in his paperhead, and making proposals as a Boyden associate.... I allow him and I gave him an office and office employee." Tr. at 39–40. "I allowed him, by recommendation of Mr. Westerfield, to use the name [in] Valencia but we never developed one single collaboration together." *Id.* at 146. Sanchez also testified as follows, "the only thing I did was to transfer free of charge graciously to Montalar the right to continue operating using the name Boyden in the territory of the autonomous region of Valencia." Tr. 297.

The evidence presented at trial clearly indicates that Boyden consistently maintained a desire to have both Sanchez and Montalar working under the Boyden name in Spain, and repeatedly advanced the position that it would be in the best interest of all parties involved if Sanchez and Montalar would cooperate and work collectively towards developing a unified Boyden in Spain. *See e.g.*, Px. 10; Px. 12; Px. 19; Px. 22. A memorandum from Andrew Gardner, an officer of Boyden, dated October 10, 1988, generated after a regional meeting held in Lisbon, indicated that Boyden was pleased with the work of Sanchez and Montalar, and wanted the arrangements between the two to be formalized in order to conform with Boyden's corporate structure, prior to the renewal of the licensing agreement. Px. 22. Members of the Boyden board were supportive of the idea of solidifying relations with Montalar by making him a shareholder. Discussions arose after the Lisbon regional meeting that Sanchez would put Montalar forward as a Boyden shareholder, and that Skala, and Gardner would support such a move. *Id.*[3] At the board meeting held in October, the board approved the admission of Montalar as a new shareholder. Dx. U at 6; Px. 33.[4]

Consistent with their arrangement, Sanchez collected Montalar's share of the 1987 license fees, and in 1989 forwarded them to Boyden along with V.S. International's share. Tr. 299–300, 373; Dx. AN; Dx. AJ. However, at some point in early 1989, the relationship between Sanchez and Montalar broke down, and in May 1989 Sanchez informed the Boyden board that he was not getting along with Montalar, and therefore, "if they wanted they should collect [license fees] directly

---

3. Sanchez testified that if the partnership between Sanchez and Montalar worked out, Montalar would agree to become a shareholder in Boyden, but Sanchez also testified that his support for Montalar as a shareholder was conditional. Tr. 304–05. *See* Px. 5. This Court finds that at one point, prior to the rift in their working arrangement, Sanchez agreed, albeit reluctantly, to back Montalar in his bid to become a shareholder. Px. 22. Evidence introduced in the form of Montalar's deposition reads as follows:

Q: When you tried to become a shareholder, was it not a fact that V.S. International or Victorio Sanchez called the attention to Boyden that you cannot be a shareholder because you are not a licensee nor a partner of the licensee?

A: Well, to my knowledge, it was to the contrary. I had impression, not only impression, that I was backed by V.S. International as a shareholder.

Tr. 446.

4. According to the Boyden Policies and Operating Procedures, approved by the Board of Directors and effective May 1, 1987, "[t]he admission of persons to shareholding is reserved to the Board of Directors and is restricted to employees of Boyden World Corporation or its Licensees or subsidiaries." Px. 34; Dx. CL at W. 11, Pp. 1. The evidence presented does not make clear whether the board considered Montalar to be either an employee, a licensee, or subsidiary, but nevertheless, Montalar was approved as a shareholder.

from [Montalar]." Tr. 302. *Accord* Px. 48. The disagreements between Sanchez and Montalar were not reconciled, and by way of a letter dated July 4, 1989, with a copy to Boyden, Px. 8, Sanchez notified Montalar that in his view Montalar had violated their agreement; and, accordingly, the arrangement under which they had been operating was thereby ended. Px. 7. Sanchez testified that he decided to terminate Montalar, because Montalar had been acting against Boyden's interests by, *inter alia,* charging different fees, failing to report his billings, exchanging letters with the Hong Kong and London offices without sending copies to Sanchez, and by encroaching on Sanchez's clients. Tr. 44–46. *See* Tr. 200–205. Though Sanchez had previously informed Boyden that he believed he could not collect the licensing fees from Montalar, Sanchez did not notify the board of all the other problems he was allegedly having with Montalar, culminating in the July 4, 1989 termination. Tr. 133.

Because of Boyden's desire to continue its affiliation with Montalar, a desire that is, in part, explained by the fact that Montalar's billings exceeded those of Sanchez by a factor of two, Dx. AC, "Garner and Skala [ (two Boyden officers) ] were asked by the Board of Directors to visit the two offices in Spain in order to ascertain the reasons for the rupture between Montalar and Sanchez." Px. 41. Out of this investigation arose a number of recommendations, Px. 42, among them was a proposal for Sanchez and Montalar to share joint licenses in the Spanish territory. This idea was proposed to Sanchez and Montalar by way of letters from Westerfield, dated November 1, 1989, Px. 3; Px. 3–1, which again advanced Boyden's position that all parties would benefit from such an arrangement. *Id. Accord* Tr. 74. By way of a memorandum, dated November 21, 1989, and faxed to Sanchez, Westerfield reiterated Boyden's desire to have Sanchez and Montalar work together. Dx. AZ.

Sanchez testified that since he already, had an exclusive license for Spain, which because of the automatic extension clause was, as of July 1, 1989, extended until the end of 1990, Px. 2 ¶ 3(a); Px. 48, he declined to accept the new proposal. Tr. 159–160; Px. 35. Furthermore, Sanchez testified that it was his belief that by making such a proposal to Montalar, Boyden had breached the exclusivity clause of the Agreement. Tr. 160, 200; Px. 35 at 3.

Boyden was troubled by Sanchez's refusal to accept the November 1, 1989 arrangement, and strenuously objected to Sanchez's firing of Montalar. Boyden instructed Sanchez that, since Montalar had become a shareholder in Boyden while operating under the agreement with Sanchez, Sanchez could not fire Montalar, regardless of his exclusive license. Px. 36 (letter from Garner and Skala, stating "Notwithstanding the accuracy of your statement that you are the exclusive licensee for spain you had no right to terminate the services of Jose Enrique Montalar.... Neither before or subsequently have the Board approved his termination and therefore he continues to have the right to work for Boyden in Spain."); Px. 48 (letter from Westerfield, stating "as you know, Montalar is an approved Shareholder in Boyden and can only be removed by the board of directors. You cannot remove him and neither can I ... I and the board must deal directly with Montalar.").

Boyden conducted business as if Montalar had *de facto,* become a licensee. Dx. AL (memorandum from Gardner to Westerfield recommending that "[i]f Sanchez and Montalar will not compromise and work in Boyden's collective interest, advise the Board on the wisdom of not *renewing* license agreements with *either* of them....") (emphasis added). *See also* Px. 48; Dx. AK. Additionally, Boyden operated under the assumption that Montalar had an agreement with Boyden that extended at least until the end of 1989. Dx. AC (memorandum from Gardner to Westerfield stating "Montalar entered an undertaking with us in 1986; Montalar's current agreement with us runs through to 31/12/89."). Furthermore, other Boyden licensees referred items of business to Montalar in the Spring of 1990, well after Sanchez had terminated his arrangement with Montalar, Tr. 383; Px. 32.

The Boyden board was well aware that Montalar was continuing to operate his busi-

ness using the Boyden name, as demonstrated by a confidential fax, dated February 5, 1990, in which Montalar informed Westerfield of the following: "[a]lthough I am going to be careful, I can not stop business here with all actual clients and promotions in course. So, I suggest this situation must get priority attention." Px. 44. Boyden's awareness of the situation is also demonstrated by an April 20, 1990 letter received from Bankinter, a client of Boyden, in which Bankinter seeks clarification of the relationship between Montalar, Sanchez, and Boyden. Px. 25.

By not accepting Sanchez's termination of Montalar, Boyden refused to recognize Sanchez's autonomy over the territory for which he had been given an exclusive license. Additionally, while there was no evidence presented that Boyden had entered into a formal written license agreement with Montalar, see Tr. 382, 441, the evidence indicates that Boyden at least condoned, if not encouraged, Montalar's continuation of his business. See Tr. 420;[5] Px. 44, Px. 25; Px. 26. The fact that on the very same day that Boyden terminated the Sanchez/V.S. International license, June 4, 1990, Boyden instructed its shareholders to transfer business to Montalar, without the signing of a new agreement in the interim, strongly indicates that Boyden had been conducting business with Montalar as if he were a licensee. Dx. CA.

Since Sanchez considered the contract breached by the November 1, 1989 letter, Sanchez did not remit license fees which were due for the second half of 1988 and all of 1989. Tr. 323–24, 336–339, 362–66. Nevertheless, Sanchez continued to assert his rights under the contract and continued to use the Boyden name. By way of a memorandum sent to all Boyden partners, dated April 6, 1990, Sanchez declared the following: "I [Sanchez/V.S. International] have a contract of exclusivity of Boyden for Spain. . . . Last week in Geneva, several of you were told by P.W. [Westerfield] that I was leaving

Boyden. *This is not true.*" Px. 38 (emphasis in original). In this memorandum, Sanchez also suggested that at the next meeting the stockholders discuss the exclusivity of license contracts, and stated that he looked forward to seeing the other shareholders soon. *Id.*

Sanchez's assertions that V.S. International still had exclusive rights is demonstrated by other correspondence. On April 10, 1990, V.S. International sent a correspondence to a firm in Valencia (Generos De Puntos Ferry, S.A.) informing them that V.S. International was the exclusive Boyden licensee for Spain, and that they should stop working with Montalar. Px. 26. The Court finds Sanchez's continued use of the Boyden name, and his continued assertion of his rights under the contract, to be compelling evidence regarding Sanchez's desire to continue receiving the benefits of the contract at this time. See Px. 32 (Sanchez using the Boyden name May 11, 1990). However, even while continuing to use the Boyden name and to assert his rights under the contract, Sanchez refused to pay the license fees that were past due, as well as those which became due for 1990. Tr. 323–24, 336–339, 362–66.

By way of a letter dated April 27, 1990, Boyden informed Sanchez that he still had not paid the license fees that were due; and that failure to make such payments would constitute grounds for default. Px. 29. Sanchez did not make the payments, and Boyden held him in default. By way of a letter, dated June 4, 1990, Dx. CB, Boyden informed Sanchez that, based on his failure to pay license fees, the Agreement was thereby terminated as of May 31, 1990. Dx. CB. On the same day, June 4, 1990, Gardner sent a fax memorandum to all Boyden office managers informing them that Sanchez's license agreement had expired, and that "any future business for Spain should be referred to Jose

---

**5.** The testimony of Richard Foy discussing the rights to Boyden's name during time period in question, including the time period after Montalar had been fired, was as follows:

> Q: And of course, you know, during all that particular period, Sanchez was the exclusive licensee of Boyden, is that correct?

> A: . . . If by exclusive licensee you meant that only Sanchez can do business in Spain I would have to disagree with you.

Tr. 420.

Montalar in Valencia." Dx. CA.[6].

## DISCUSSION

█ In this breach of contract action, plaintiffs have the burden of proving the material allegations in the complaint by a fair preponderance of the evidence. Similarly, with respect to the counterclaim asserted herein, defendant bears the same burden. In determining whether the parties have sustained their respective burdens of proof, this Court, acting as the trier of fact, has considered all the relevant evidence, as presented at trial, and has given appropriate weight to that evidence which the Court found credible, and has rejected that which the Court found not to be credible.

## I. LIABILITY ISSUE

█ The issue of liability centers upon the Agreement entered into by the parties granting plaintiffs an exclusive license in Spain. This Court finds that while defendant never explicitly granted a license to Montalar to operate in another area of Spain, defendant conducted its business in such a way as to deprive plaintiffs of the exclusivity of the contract in violation of Section 2(a) of the Agreement. At trial defendant endeavored to advance the position that, given the close business relationship that existed between Montalar and Sanchez at the time the Agreement was executed, defendant's dealings with Montalar subsequent to his dispute with Sanchez amounted to nothing more than an attempt at peacemaking, and therefore cannot be considered a violation of the Agreement. Upon consideration of the evidence propounded at trial, the Court rejects the argument advanced by defendant, and finds that plaintiffs have satisfied their threshold bur-

den of showing that defendant breached the Agreement.

Building on this essential finding, this Court also finds that by continuing to deal with Montalar, as a *de facto* licensee, after Montalar's agreement with Sanchez had been terminated, defendant breached its obligations under the Agreement; specifically, the exclusivity provision of the license Agreement. Defendant's conduct prevented plaintiffs' from receiving the full benefit of the bargain. Further, defendant's insistence that plaintiffs could not terminate Montalar, notwithstanding the exclusive license provision, deprived plaintiffs of their contractual rights. *See also Amgen, Inc. v. Chugai Pharmaceutical Co.,* 808 F.Supp. 894, 899 (D.Mass.1992) ("[a]n 'exclusive license,' however, provides the licensee with legal grounds to prevent the patent owner from granting further licenses for the manufacture, use, and sale ... either directly or by condoning infringing activity." (citing *Western Electric Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.), *cert. denied,* 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930)).

As the Second Circuit stated in *September-tide Pub., B.V. v. Stein & Day, Inc.,* 884 F.2d 675 (2d Cir.1989), under New York law, "before rescission will be permitted the breach must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'" *Id.* at 678 (quoting *Callanan v. Powers,* 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910)). The extraordinary remedy of rescission "is appropriate only when a breach may be said to go to the root of the agreement between the parties." *Id.* (citing *Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980).[7]

---

**6.** Gardner's memorandum went on to state the following: "[L]et me take this opportunity of putting on formal record our appreciation to Jose [Montalar] for his patience and resilience in what has been and still remains (for a while) a difficult situation. *Id.*

**7.** "Under New York law, there exists in every contract an implied covenant of good faith and fair dealing." *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 767–68 (S.D.N.Y.1990) (citing *Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 412 N.Y.S.2d 827, 830, 385 N.E.2d

566, 569 (1978); and citing *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1517 (S.D.N.Y.1989)). The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement. *Id.* (citations omitted).

Though the argument was not advanced by plaintiffs at trial, defendant could have been found to have violated the implied covenant of good faith and fair dealing since the acts of Boyden may have had "the direct 'effect of de-

Based on the evidence presented at trial, this Court finds that Boyden materially breached the exclusive license Agreement by failing to abide by the exclusivity provision. The conduct engaged in by Boyden would have thus been sufficient grounds for plaintiffs to have terminated the contract and sued for total breach, or at the very least to have invoked the default provision of the Agreement and given defendant thirty (30) days to remedy its breach. Px. 2 at ¶ 12(b).[8]

■■■ However, even finding that defendant Boyden's conduct rose to a level constituting a breach of the Agreement, based on the facts in this case, the Court does not find defendant to be liable. Under New York law, "[t]he power to terminate a continuing contract because of a particular breach of that contract is a power of election." *Apex Pool Equip. Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir.1969). When one party to a contract materially breaches the contract during the course of a continuing performance, the non-breaching party " 'has a choice presented to him of continuing the contract or of refusing to go on.' " *Id.* (quoting *Emigrant Industr. Savs. Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943)). When the " 'injured party chooses to go on, he loses his right to terminate the contract because of the default.' " *Apex Pool Equip.,* 419 F.2d at 562. In short, "[o]nce the non-breaching party elects to continue the contract, he may not at a later time renounce his election and seek to terminate based on the prior breach." *Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.,* 662 F.Supp. 798, 805 (S.D.N.Y.1987), *aff'd,* 865 F.2d 513 (2d Cir.1989). *See National Westminster Bank v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991) (finding that where a party to an agreement has actual knowledge of another party's breach and continues to accept the benefits of the contract, the non-breaching party has waived the breach); 5 Williston on Contracts, § 683 at 270 (3d ed. 1961).

In the instant case, the Court has found that defendant's actions rose to the level of a breach of the Agreement. However, plaintiffs did not terminate the contract, but continued to conduct business pursuant to the contract, and continued to receive the benefits of using the Boyden name. Plaintiffs cannot elect to continue with the contract, continue to receive the benefits from it, and thereafter bring an action for rescission or total breach. *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.,* 952 F.2d 643, 649 (2d Cir.1991) ("[plaintiff's] decision to continue receiving benefits pursuant to the . . . Agreement was tantamount to an election to affirm the contract" (citing *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 767 F.Supp. 1269, 1280 (S.D.N.Y.1991); and citing *North Country Rocky Point, Inc. v. Lewyt–Patchogue Co.,* 60 A.D.2d 866, 866, 401 N.Y.S.2d 258, 258–59 (2d Dep't), *appeal denied,* 44 N.Y.2d 643, 405 N.Y.S.2d 1027, 376 N.E.2d 936 (1978))); *Bigda v. Fischbach Corp.,* 849 F.Supp. 895, 901 (S.D.N.Y.1994) (finding that by electing to continue, plaintiff relinquished the opportunity to terminate the agreement because of defendant's breaches).

In the instant case, plaintiffs never attempted to terminate the agreement, either by exercising the default provision contained in paragraph 12 of the Agreement, or by terminating the Agreement based on defendant's breach. Accordingly, the agreement remained in effect until defendant terminated it by giving plaintiffs written notice and, thirty (30) days thereafter, terminating the Agreement as provided in the termination clause. Agreement at ¶ 12. Even viewing plaintiffs' written correspondence to defendant as plaintiffs' giving notice to defendant, and giving it an opportunity to cure the breach, plaintiffs never terminated the agreement, and did not bring the instant action until after defendant terminated the agreement.

---

stroying or injuring the right of the other part[ies] [ (Sanchez and V.S. International) ] to receive the fruits of the contract." *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 768 (S.D.N.Y.1990) (citations omitted).

**8.** It should be noted that the Court rejects plaintiffs' contention that defendant's act of proposing new terms to plaintiffs in the November 1, 1989 letter in and of itself constituted a breach of contract. *See Marvel Entertainment Group, Inc. v. Young Astronaut Council,* 747 F.Supp. 945, 951 (S.D.N.Y.1990) (Carter, J.).

Thus, in view of plaintiffs' affirmance, their refusal to perform their end of the bargain by making the requisite licensing payments, was impermissible. *See ARP Films, Inc.,* 952 F.2d at 649; *McDonald's Corp. v. Robert A. Makin, Inc.,* 653 F.Supp. 401, 403–04 (W.D.N.Y.1986) (finding that notwithstanding alleged breach by plaintiff, defendant's failure to make periodic payments constituted breach when defendant accepted benefits of contract).

A party's failure to make required payments as required by an Agreement has been held to be a material breach as a matter of law, and would thus authorize defendant Boyden's termination of the contract. *ARP Films, Inc.,* 952 F.2d at 648–49, (finding that "failure to tender payment is generally deemed a material breach of a contract ..." (citing *Schneider v. Dumbarton Developers, Inc.,* 767 F.2d 1007, 1014 (D.C.Cir.1985); *Jafari v. Wally Findlay Galleries,* 741 F.Supp. 64, 67–68 (S.D.N.Y.1990); *Truglia v. KFC Corp.,* 692 F.Supp. 271, 276–77 (S.D.N.Y. 1988), *aff'd without op.,* 875 F.2d 308 (2d Cir.1989)).

Accordingly, based on the findings of fact set forth above, this Court finds that defendant is not liable to plaintiffs for breach of contract because plaintiffs elected to affirm the contract by continuing to receive benefits thereunder. Furthermore, plaintiffs could not thereafter engage in self-help, by withholding their payment of license fees, which they were contractually obligated to remit to defendant. Therefore, defendant's exercise of the default provision, paragraph 12 of the Agreement, was entirely appropriate.

## II. DAMAGES ISSUE

Having found defendant not to be liable this Court need not reach the issue of damages, however, the Court will nonetheless briefly discuss the issue of plaintiffs' damages.

In assessing damages, it is axiomatic that a party injured by a breach of contract must be placed in the same economic position in which he would have been, had the contract been fully performed. *See Bausch & Lomb v. Bressler,* 977 F.2d 720, 728–29 (2d Cir. 1992); *Wallace Steel, Inc. v. Ingersoll–Rand*

*Co.,* 739 F.2d 112, 115 (2d Cir.1984); *Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 92 (2d Cir.1984); *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.,* 807 F.Supp. 1007, 1024 (S.D.N.Y.1992); *Menzel v. List,* 24 N.Y.2d 91, 97–98, 246 N.E.2d 742, 745, 298 N.Y.S.2d 979, 983 (1969); *Brown v. Lockwood,* 76 A.D.2d 721, 742–43, 432 N.Y.S.2d 186, 201 (2d Dep't 1980).

With respect to proving such damages, it is well established under New York law, that a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract. *See S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 852 (2d Cir.1987); *Lexington Products Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir.1982); *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977). While scientific rigor in the calculation of damages is not required, *Lexington Products Ltd.,* 677 F.2d at 253, "New York law does not countenance damage awards based on '[s]peculation or conjecture.'" *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1010 (2d Cir.1991) (quoting *Berley Indus., Inc. v. City of New York,* 45 N.Y.2d 683, 687, 412 N.Y.S.2d 589, 591, 385 N.E.2d 281, 283 (1978)).

Plaintiffs originally sought two classes of actual damages: (1) expenses in establishing the business and promoting the Boyden name; and (2) lost revenues. Having reviewed the evidence offered by plaintiffs on the issue of damages, the Court finds that, even assuming *arguendo,* defendant were liable, plaintiffs have failed to establish the existence of actual damages under New York law.

■ First, with respect to the alleged expenditures in promoting the Boyden name, plaintiffs' contention is that, after receiving the license from Boyden in 1987, they expended substantial sums of money to build the business with a view towards a long-term licensing relationship with Boyden. Expenditures claimed by plaintiffs include: (1) mailings, press follow-up, travel, round tables and conferences to be used by public relations and media consultants in building the firm's image in Spain; (2) installing new

premises, furniture and equipment in anticipation of becoming a leading executive recruiting firm in Spain as a result of the Boyden license; and (3) training of consultants and researchers in the Boyden culture and procedures. Plaintiffs contend that, as a result of defendant's breach of the agreement, these expenditures were rendered useless and constituted a waste of plaintiffs' resources, for which they should be compensated.

◼ Although not the normal measure of damages, New York law does recognize and award reliance damages in appropriate cases. *See, e.g., Kenford Co. v. County of Erie,* 537 N.E.2d 176, 73 N.Y.2d 312, 540 N.Y.S.2d 1 (1989); *Farash v. Sykes Datatronics, Inc.,* 452 N.E.2d 1245, 59 N.Y.2d 500, 465 N.Y.S.2d 917 (1983). Based on the evidence presented herein, however, this Court finds that plaintiffs have not sustained their burden of proof with regard to reliance damages.

Firstly, this Court found, as set forth above, that defendant breached the Agreement after the end of the initial three-year term and, thus, the Court concludes that plaintiffs obtained the full benefit of any start-up expenses. At trial, plaintiffs endeavored to advance the position that they expected a long-term relationship with Boyden, in the order of ten (10) years, and made expenditures accordingly. The Court finds that any such expenditures would not constitute reasonable reliance since the initial contract, by its terms, was only for three years. Thus, in the absence of any additional assertions or promises, any reasonable reliance by plaintiffs could only have been based on a potential three-year association.

Secondly, when the Agreement was initially executed plaintiffs were engaged in executive search under the name V.S. International; and, after the contract was terminated, they continued in this business. The record indicates that not only did plaintiffs continue to operate their business, but also had increased revenue for the year after the contract was terminated. Thus, plaintiffs cannot

contend that their start-up expenses were rendered useless, but to the contrary, plaintiffs have continued to receive the benefits of their investment, and have shown no actual damages. Based on plaintiffs continued running of a successful business, any compensation for these initial expenses would not place plaintiffs in the same position as they were prior to the execution of the contract, as reliance damages are intended to do, but would instead constitute a windfall for plaintiffs. Accordingly, the Court finds that in this case, plaintiffs have failed to carry their burden of proof with respect to reliance damages.

◼ The second class of alleged damages concerns lost profits which allegedly resulted from defendant's breach. Plaintiffs failed to establish with any level of certainty that any profits were lost, or that any business that was executed by Montalar would have or could have been executed by plaintiffs. *See* Px. 25.[9]

Having examined the evidence proffered by plaintiffs on the issue of actual damages, the Court finds that, plaintiffs have failed to meet their burden of demonstrating that, even if defendant were liable, they should be awarded actual damages. Accordingly, even assuming *arguendo,* that plaintiffs were able to establish defendant's liability, they would still then only be entitled to recover nominal damages as vindication of their contractual rights. *See Hirsch Elec. Co. v. Community Services, Inc.,* 145 A.D.2d 603, 605, 536 N.Y.S.2d 141, 143 (2d Dep't 1988) ("it is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."); *see also C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc.,* 172 A.D.2d 206, 208, 567 N.Y.S.2d 716, 718 (1st Dep't 1991).

---

9. Additionally, on the record in open court, plaintiffs withdrew the issue of speculative damages, stating that plaintiffs would only show and prove actual expenses and losses. Thus, this Court concludes that plaintiffs withdrew their claim for lost profits and left only to be addressed plaintiffs' reliance damages.

## III. DEFENDANT'S COUNTERCLAIMS

■ Based on the evidence presented at trial this Court finds that defendant has sustained its burden of proving its three counterclaims by a preponderance of the evidence. As set forth above, the Agreement at issue required plaintiff V.S. International to remit license fees to defendant Boyden, and plaintiff Sanchez, as the president of V.S. International, guaranteed these payments. Defendant has introduced sufficient evidence in the form of testimony and exhibits to show that plaintiffs were obligated to pay and failed to pay license fees for the second half of 1988, all of 1989, and the first two quarters of 1990, at which point the contract was terminated by defendant's exercise of the termination clause, paragraph 12 of the Agreement. Accordingly, defendant Boyden is entitled to recover $68,872 in unpaid license fees representing the second half of 1988, all of 1989, and the first five months of 1990. Pursuant to the guarantee provision of the Agreement, plaintiff Sanchez is liable to Boyden as a guarantor. *See ARP v. Marvel Entertainment*, 952 F.2d 643, 649 (2d Cir. 1991).

■ Defendant has also advanced a counterclaim based on V.S. International's failure to remit search referral license fees to other Boyden licensees pursuant to the Agreement. The record indicates that V.S. International failed to remit such fees to other licensees in accordance with the Agreement. Tr. 391–392. The uncontroverted testimony of Richard J. Foy, Boyden's senior vice president for finance and administration, established that plaintiffs owed Boyden's London Licensee $4,500 and Boyden's Swedish Licensee $4,052. Tr. 391. The London and Swedish licensees deducted these amounts from their license fee payments advanced to Boyden. Plaintiffs do not contest that such debts were due to the licensees, nor do they contest that the debts were assignable, or that the adjustment in fee payments made by Boyden and its licensees making Boyden the holder of

these debts prejudiced plaintiffs in any way. Accordingly, based on plaintiffs' failure to pay these fees as required to do by the terms of the Agreement, Boyden has been damaged in the amount of $8,552.

■ Finally, defendant has interposed a counterclaim to recover damages suffered in the form of monies expended in Spain in protecting its trademark. The preamble of the Agreement states in relevant part as follows: "Licensor owns and has developed, through research, advertisement and promotion, client service and otherwise, the business of executive recruitment under the name "Boyden" on a worldwide basis." Px. 2 at 1. Furthermore, Paragraph 4 of the agreement states in relevant part:

> Upon termination of this Agreement by either Licensor or Licensee, Licensee and Control Individuals shall immediately refrain and desist from the use of the name and character "Boyden" in any manner whatsoever or as part of any other word, name, character or logo; and as soon as practicable after receipt or delivery of notice of such termination … shall cause licensee's corporate name to be changed to another corporate name which shall in no way resemble the Name [Boyden].

Richard Foy testified that during the course of this action, plaintiffs filed applications seeking to obtain the rights to the Boyden trademark in Spain "in six different categories, despite the fact that we [Boyden] already had registered that trademark." Tr. 392. Foy testified that it cost Boyden approximately $9,700 to protect the trademark in Spain. *Id.* Based on Foy's uncontroverted testimony, this Court finds that defendant has satisfied its burden of proof as to this issue. Defendant argues that based on the above cited portions of the Agreement, as well as paragraph 14,[10] this Court should find that the Agreement was intended to cover such circumstances, and that defendant was

---

10. Paragraph 14 of the Agreement reads in relevant part:

Licensee and each of the Control individuals, jointly and severally, hereby indemnify and agree to hold licensor harmless from any loss, claim, damage, suit, proceeding or any other action arising out of the operation of the executive recruiting business of licensee in respect to the subject matter of this agreement except any liabilities which may accrue as a result of conduct specifically mandated and directed or authorized by licensor.

damaged by plaintiffs' attempt to register licensor's mark. Since plaintiffs did not contest this issue at trial, this Court finds that defendant has satisfied its burden of proof as to this counterclaim.

### CONCLUSION

For the reasons stated above, this Court finds, based on the evidence presented at trial, that plaintiffs have failed to prove by a preponderance of the evidence that defendant is liable for breach of contract, and also failed to prove the existence of any damages. Additionally, the Court finds that defendant has satisfied its burden of proof with regard to its counterclaims, and judgment should be entered accordingly.

The Clerk of Court is hereby ordered to enter a judgment in this action consistent with this Opinion and Order.

**SO ORDERED.**