**GOVERNMENT GUARANTEE FUND OF THE REPUBLIC OF FINLAND, SAASTOPANKKIEN KESKUS-OSAKE-PANKKI (SKOPBANK), 35 ACRES ASSOCIATES, 12 ACRES ASSOCIATES and BENEFORI OY, Plaintiffs**

**v.**

**HYATT CORPORATION, Defendant**

Civ. No. 1995-49

District Court of the Virgin Islands

Div. of St. Thomas and St. John

April 4, 1997

Warren B. Cole, Esq., Richard Hunter, Esq., (Hunter, Colianni, Cole & Turner), St. Croix, U.S.V.I., Michael Baylson, Esq., and Edward G. Biester, III, Esq., (Duane, Morris & Heckscher), Philadelphia, PA, *for Plaintiffs*

John Zebedee, Esq., (Hymes & Zebedee), St. Thomas, U.S.V.I., R. Eric Moore, Esq., St. Croix, U.S.V.I., James Renard, Esq., John Sopuch, Esq., and Jamil Alibhai, Esq., (Bickel & Brewer), Dallas, TX, *for Defendant*

MOORE, *Chief Judge*

## MEMORANDUM

A hearing was held on March 12, 1997 on the plaintiffs' motion for partial summary judgment on the defendant's remaining counterclaims for breach of contract. For the following reasons, plaintiffs' motion will be granted.

### I. Factual and Procedural Background

Hyatt Corporation ["Hyatt" or "defendant"] managed a resort on the island of St. John ["the hotel"] from March of 1990 until it

was removed from the hotel pursuant to this Court's order in September of 1996. *Government Guarantee Fund v. Hyatt Corp.*, 34 V.I. 257, 166 F.R.D. 321 (D.V.I.), *aff'd*, 95 F.3d 291 (3d Cir. 1996). In 1988, Skopbank, a Finnish banking corporation, had loaned over 100 million dollars to the former owner, Great Cruz Bay Development Co. ["Great Cruz"] to develop the hotel. Great Cruz consistently had difficulty keeping up with the mortgage payments to Skopbank. In 1990, Skopbank agreed to lend an additional $10.5 million to Great Cruz but insisted that another management company manage the hotel such as "Hyatt Corporation or another management group similar in size and reputation to the Hyatt Corporation." (Hyatt's Second Amended Counterclaim ["Counterclaim"], at ¶ 13.)

As a result, Hyatt, Great Cruz and Skopbank entered into a series of agreements on March 9, 1990, which included (1) a management agreement ["Management Agreement"] between Hyatt and Great Cruz; (2) a transition agreement ["Transition Agreement"] between Hyatt and Great Cruz; (3) a subordination, nondisturbance and attornment agreement ["Subordination Agreement"] between Skopbank and Hyatt; (4) a letter agreement ["Letter Agreement"] between Hyatt and Great Cruz; (5) a guaranty of payment and performance signed by Skopbank ["the Guaranty"] and (6) the loan documents. The agreements are collectively referred to as the "March 1990 Agreements."

The Management Agreement provided that Hyatt would manage the hotel for a fee. Under the Management Agreement and the Transition Agreement, the owner, Great Cruz, promised to contribute working capital and pay for the ongoing renovation program. Under the Guaranty, Skopbank promised to pay to Hyatt any working capital or renovation program expenses that Great Cruz failed to pay, subject to certain limitations. Under the Letter Agreement, Great Cruz directed Hyatt to pay directly to Skopbank any money it was supposed to pay to Great Cruz under the Management Agreement. And finally, under the Subordination Agreement, Skopbank agreed that, so long as Hyatt was not in default, the Management Agreement would remain undisturbed in the event of a foreclosure of the hotel.

In 1991 Skopbank began foreclosure proceedings against Great Cruz in this Court (Civil Number 1991-355), under the supervision

of Senior District Judge Stanley S. Brotman, sitting by designation. Control of Skopbank in the interim had been taken over by the Government Guarantee Fund ["GGF"], a Finnish governmental agency, as part of GGF's handling of the Finnish banking crisis. The foreclosure litigation was settled in February of 1995. As part of the settlement and pursuant to a court order to pay to Great Cruz, Hyatt released $5.4 million from the hotel accounts. (Response of Hyatt in Opp'n Mot. Partial Summ. J. of Skopbank & 35 Acres ["Response"] at 62.) At the judicial sale on March 20, 1995, the hotel was purchased by 35 Acres, a general Virgin Islands partnership consisting of two Finnish corporations, which are each wholly owned by Skopbank. (Counterclaim ¶¶ 48-50; Statement of Uncontested Facts, found in Mot. Partial Summ. J. of Skopbank & 35 Acres ["Uncontested Facts"] Nos. 34, 35.)

This litigation soon followed. On March 16, 1995, four days before the foreclosure sale, GGF and Skopbank filed this suit against Hyatt seeking a declaratory judgment finding Hyatt in breach of the March 1990 Agreements and alleging various claims in tort and contract. GGF and Skopbank filed an amended complaint on November 8, 1995, adding 35 Acres, 12 Acres and Benefori Oy as additional plaintiffs.[1] All of the plaintiffs, excluding GGF (which has withdrawn as a plaintiff), are referred to collectively as the "Skopbank Parties." On April 25, 1995 Hyatt filed suit against 35 Acres (Civil No. 1995-68), which the Court dismissed in January of 1996. *Hyatt Corp. v. 35 Acres Assoc.*, No. Civ. 1995-49, 1995-68, 1996 WL 165008 (D.V.I. Jan. 8, 1996). Subsequently, the Court granted partial summary judgment in favor of 35 Acres and held that the agency relationship with Hyatt was terminated as a matter of law, that 35 Acres was entitled to possession of the hotel, and that Hyatt must leave the premises. *GGF v. Hyatt*, 166 F.R.D. 321. Hyatt stayed on as manager of the hotel pending its appeal of that order to the United States Court of Appeals for the Third Circuit, and only vacated the hotel premises in September of 1996

---

[1] 12 Acres is the owner of the Villas property which adjoins the hotel. Benefori Oy is a Finnish corporation owned by Skopbank and the current asset manager of 35 Acres. (First Amended Complaint of GGF, Skopbank, 35 Acres, 12 Acres & Benefori Oy Against Hyatt Corp., Docket No. 69 ["Skopbank Parties' Complaint] ¶¶ 56, 59.)

after the Court of Appeals affirmed this Court in all respects. *GGF v. Hyatt*, 95 F.3d 291.

In January of 1997 this Court granted, in part, Skopbank's motion to dismiss or strike Hyatt's Counterclaim. *GGF v. Hyatt*, No. Civ. 1995-49, 1997 WL 49942 (D.V.I. Jan. 28, 1997). The Court also granted GGF's motion to be allowed to withdraw as a plaintiff. *Id.* All that remains of Hyatt's Counterclaim are the causes of action for breach of contract against Skopbank and 35 Acres (Count One), breach of Guaranty of payment and performance against Skopbank (Count Ten) and part of the tortious interference with contracts against Skopbank and GGF (Count Three). The Skopbank Parties, plus GGF solely as counter-defendant, now seek, and this Court will grant, summary judgment on Counts One and Ten, finding that as a matter of law Hyatt cannot prevail on its causes of action for breach of contract and breach of Guaranty. Because it depends upon the viability of the breach of contract counts, Count Three, Hyatt's tortious interference cause of action against Skopbank and GGF, necessarily falls. Accordingly, Hyatt's Second Amended Counterclaim will be dismissed in its entirety, and GGF is no longer a party to this case in any capacity.

The liability phase of the Skopbank Parties' contract claims against Hyatt will be tried to the Court sitting without a jury during the week of April 28, 1997.[2] The Skopbank Parties's other causes of action and damages, if any, will be scheduled and tried to the Court once the parties have had an opportunity to complete discovery on these phases of the case.

---

[2] This Court ruled at the hearing on March 12, 1997 that 35 Acres was a citizen of the Virgin Islands. Therefore Hyatt was entitled to a jury trial on its Counterclaim against 35 Acres, but not against Skopbank because it was a foreign state under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603. (Transcript, Mar. 12, 1997 ["Tr."] at 119.) Thus, any claims by or against Skopbank will be tried to the Court sitting without a jury. 28 U.S.C. § 1441(d). The Court specifically agreed with Judge Brotman's analysis of Skopbank's status in the foreclosure action, *GGF v. Great Cruz Bay*, Civil No. 1991-355 (D.V.I., Dec. 7, 1994), and rejected the contrary result reached in a related case in the Southern District of New York. *Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996).

## II. Discussion

### A. Standards for Summary Judgment

Summary judgment is appropriate "if the pleadings . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. V. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1985). Once the moving party properly supports its motion for summary judgment, the non-moving party must establish a genuine issue of material fact in order to preclude a grant of summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1355-56, 89 L. Ed. 2d 538 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2510. In addition "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

### B. Preliminary Matters

Along with the motion for partial summary judgment, the parties have submitted various related motions concerning the evidence placed before the Court. These include Hyatt's "Motion to Strike and Objections to Improper Summary Judgment Evidence and Brief in Support" ["Motion to Strike"], Hyatt's "Motion to Strike Plaintiffs' Summary Judgment Reply and Their Untimely Filed Evidence" ["Motion to Strike Reply"] and the Skopbank Parties' "Motion to Strike Affidavits and Declarations Submitted by Hyatt Corporation in Opposition to Plaintiff's Motion for Partial Summary Judgment on the Basis of the Parol Evidence Rule, Motion in Limine to Exclude such Evidence from Testimony

at any Trial; and, alternatively, Motion to Reopen Discovery if Parol Evidence is not Excluded" ["Motion to Strike Opposition"].[3]

The Court will not strike the submitted evidence. For each particular piece of evidence herein relied upon, the Court notes any objections and gives the reason the evidence is nevertheless considered. With respect to evidence submitted with Skopbank's reply, it for the most part merely responds to issues presented in Hyatt's opposition. In addition the reply and the evidence attached does not set forth any new reasons for granting partial summary judgment.[4] For this reason and the reasons discussed below, the Motion to Strike, the Motion to Strike Reply, and the Motion to Strike the Opposition are denied.

## C. Breach of Contract

■ Hyatt alleges in Count One of its Counterclaim for breach of contract that "[on] or about March 21, 1995, Skopbank and 35 Acres breached the Management Agreement and the Subordination Agreement by wrongfully attempting to terminate Hyatt as the manager of the Resort." (Counterclaim, ¶ 60.) In order to prevail for breach of contract under both New York and Ohio law,[5] a party

---

[3] The Court ruled on two other motions at the hearing. The Court vacated a discovery order entered by Judge Barnard. (Tr. at 118.) In addition, Hyatt had filed a motion to strike the plaintiffs' untimely reply to Hyatt's Counterclaim. The Court stated that it "would probably allow the answer to be filed, but I will look at the new affirmative defenses and see whether or not they will be allowed." (Tr. at 128.) The Court now rules that Skopbank Parties' Answer to Hyatt's Counterclaim is permitted to be filed, and Hyatt's motion to strike the reply is denied. Because the Court grants summary judgment on the Counterclaim in Skopbank Parties' favor, the issue of new affirmative defenses to the Counterclaim is moot.

[4] See Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1134 & n.* (7th Cir. 1996) ("'Where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment—both briefs and affidavits—may properly address those issues.'" quoting Baugh v. City of Milwaukee, 823 F. Supp. 1452, 1457 (E.D. Wis. 1993), aff'd, 41 F.3d 1510 (7th Cir. 1994)).

[5] Both parties cite to both New York and Ohio law. The Management Agreement has a provision stating that the agreement "shall be governed in all respects by the internal laws of the State of Ohio . . . ." (Section 20, at 75.) The Subordination Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of New York." (¶ 25 at 17). Because the breach of contract issue concerns both the Subordination and the Management Agreements, it is unclear which law should be applied. However, neither party claims that the outcome would differ under either state's law or that Ohio's contract law differs from New York's in any significantly

must prove: (1) a contract; (2) performance by the party seeking recovery; (3) breach of contract by the other party; and (4) damages attributable to the breach. *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 667 (S.D.N.Y. 1996) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522 (2d Cir. 1994)); *American Sales, Inc. v. Boffo*, 71 Ohio App. 3d 168, 593 N.E.2d 316, 321 (Ohio Ct. App. 1991).

The Skopbank Parties argue that Hyatt cannot prevail because Hyatt failed to perform its duties under the March 1990 Agreements. Hyatt asserts that it fully performed under the Management Agreement, or at the very least there are questions of material fact concerning it's performance, and that 35 Acres breached by wrongfully terminating it as manager without strictly complying with the termination provisions in the Management Agreement. Similarly, Hyatt contends that Skopbank breached the Subordination Agreement by not making sure that the Management Agreement remained undisturbed by the foreclosure.

More specifically, the Skopbank Parties take the position in their motion for partial summary judgment that Hyatt was properly terminated by 35 Acres because Hyatt was in material default of the March 1990 Agreements, when 35 Acres came into title of the hotel, on at least three grounds: (1) Hyatt's failure to pay monies due to Skopbank and 35 Acres; (2) Hyatt's failure to prevent hotel funds from being dissipated by Great Cruz and Great Cruz entities; and (3) Hyatt's failure to provide Skopbank or 35 Acres with information they requested and were entitled to receive. Hyatt counters that it was not properly terminated because 35 Acres did not comply strictly with the notice of termination provisions in Section 12 of the Management Agreement. Hyatt further submits that it was not in material default because: (1) Hyatt had no obligation to pay any money to Skopbank or 35 Acres; (2) Hyatt was not at fault for the dissipation of hotel funds by Great Cruz and the Great Cruz entities; and (3) Hyatt provided all the information it was legally obligated to provide.

---

relevant respect. Moreover, resolution of the contract issues in this case turn on basic principles of contract law which would be followed by the courts in either New York or Ohio.

### 1. Notice and Termination Provisions

Hyatt argues that 35 Acres' failure to comply with the termination provisions of the Management Agreement alone warrants denial of the Skopbank Parties' motion for partial summary judgment and the granting of judgment in Hyatt's favor on Count One of its Counterclaim. In other words, Hyatt contends that even if it was in material breach of the Management Agreement (which Hyatt maintains it was not), it would still have a breach of contract cause of action against 35 Acres for 35 Acres' failure to comply with Section 12 of the Management Agreement setting out the procedure for terminating the agency agreement. This Court finds that because Hyatt was in default at the time 35 Acres acquired ownership of the hotel, 35 Acres was not bound by the Management Agreement, including Section 12.

Alternatively, even assuming 35 Acres was bound by the Management Agreement and even assuming that Section 12 was not complied with, Hyatt does not have a cause of action because Hyatt was not in fact terminated on March 21, 1995. Indeed, Hyatt uses the term "attempt at termination" in its breach of contract counterclaim, because in fact Hyatt did not leave the premises after receiving the March 21st letter from 35 Acres. Hyatt continued acting as manager of the hotel, and Hyatt continued paying itself management fees. Nor can Hyatt claim that its actual termination in September of 1996 was somehow a breach of contract because of Skopbank and 35 Acres failure to comply with the termination provisions. It cannot be disputed that 35 Acres' letter of March 21, 1995 put Hyatt on notice of its material defaults. Hyatt's failure even to attempt to cure those defaults negates any claim it has based upon Section 12. In other words, while the letter of March 21, 1995 may have given Hyatt the right to cure any defaults and remain on the property, it did not give Hyatt the right to stay on the property, continue to breach its obligations until removed by court order, and still have a cause of action for breach of the termination provisions.

> a. 35 acres is not bound by Section 12 because Hyatt was in default at time of foreclosure sale

Section 12 of the Management Agreement, entitled "Events of Default," provides that either failure to pay any sums due to the other party after notice and failure to cure within fifteen days, or failure to perform any other obligations under the agreement after notice and failure to cure after thirty days, constitute an "event of default." (Management Agreement, §§ 12 (1) & (2) at 65.) The notice must "specify[] such failure." *Id.* Section 12 further states that, after an event of default has occurred, "the non-defaulting party may give to the defaulting party notice of intention to terminate the [agreement] after the expiration of a period of fifteen (15) days from the date of such notice and, upon the expiration of such period, the [agreement] shall expire." (*Id.*, § 12, at 66.)

The Skopbank Parties point to several letters that they assert constitute proper notice under Section 12, either individually or collectively. These letters include three letters from counsel for Skopbank to Hyatt dated July 24, 1992, November 18, 1992, and December 21, 1992, which deal with Hyatt's failure to prevent principals of Great Cruz from wrongfully withdrawing approximately $550,000 from the hotel accounts, and Hyatt's refusal to stop supplying free utilities and other services to the adjoining Villas property, also owned by Great Cruz. (Exs. D-1, D-2, & D-3 to Mot. for Partial Summ. J.) The letter of November 18, 1992, also included a report from Arthur Anderson purporting to show a loss of approximately $1,500,000 to the hotel from the failure of Hyatt to recover payment for goods and services supplied to the Villas Property. (Ex. D-2.)[6] None of the above letters threatened termi-

---

[6] Hyatt filed a "Motion to Strike and Objections to Improper Summary Judgment Evidence and Brief in Support" ["Motion to Strike"] specifically objecting to all of the letters introduced by the Skopbank Parties as improper evidence that cannot be considered by this Court. Hyatt complains that the letters were not "attached to an affidavit which verifies their authenticity" (Motion to Strike at 3, n.7) and that such letters are hearsay. This Court has not stricken the letters attached as Exhibits D-1 through D-12 to Skopbank Parties' Motion for Partial Summary Judgement. All these letters were attached to the Skopbank Parties' Complaint filed November 8, 1995, and Hyatt did not dispute their authenticity in its answer. (*See* Hyatt's Answer to First Amended Complaint and Counterclaims Against 35 Acres, Skopbank and GGF, ["Answer"] Docket No. 176.) Moreover, Hyatt has referred to the March 1, 1995, March 21, 1995, June 8, 1995, and June 19, 1995 letters in its own pleading (Answer at 60-61); Hyatt itself attached the July 24, 1992, November 18, 1992 and December 21, 1992 in support of its opposition to the motion for partial summary judgment (see Exs. 12 & 13 to the Alibhai Declaration, Ex. K to the Shindler Declaration); and Hyatt attached other letters,

nation, nor did any of them specifically refer to any sums that should be paid to Skopbank under the Management Agreement.

Another letter from Skopbank to Hyatt was sent on August 6, 1993. In that letter Skopbank, for the first time, specified an amount and demanded that it be paid as an "Owner's remittance" in accordance with the Management and Letter Agreements. (Ex. D-4.) Another letter dated June 29, 1994 stated that "Skopbank has repeatedly requested an Owner's Remittance and this letter shall serve as yet another request." (Ex. D-5.) On July 12, 1994, Skopbank reiterated its demand for an Owner's Remittance, and pointed out Hyatt's "breaches" with regard to Great Cruz' improper access to hotel funds and the unpaid Villas bills. (Ex. D-6.)

In February of 1995 the foreclosure litigation was settled and a consent judgment was signed by all the parties and entered by Judge Brotman. (Ex. G to Mot. Partial Summ. J.) On March 1, 1995, counsel for Skopbank and GGF sent Hyatt a letter which gave express notice of Hyatt's defaults pursuant to Section 12 of the Management Agreement. (Ex. D-7.) The letter incorporated by reference all of the earlier letters described above. The March 1st letter also referred to certified financial statements as support that Skopbank was entitled to payments from Hyatt which Hyatt had wrongfully failed to make.[7] Skopbank also gave notice that Hyatt had "defaulted on its obligations to monitor and service the [Villas property,] secure Hotel accounts, implement an appropriate accounting system and/or obtain payment of sums due and owing for Hotel services." *Id.* at 4. Other alleged defaults are listed which are not relevant for purposes of this motion.

Hyatt did not respond to the March 1, 1995 letter before the foreclosure sale pursuant to the consent decree on March 20, 1995, at which the hotel was purchased by 35 Acres. The next day, March 21, 1995, counsel sent another letter to Hyatt on behalf of 35 Acres,

---

including the June 29, 1994 and July 12, 1994, to its opposition (see Exs. 14 & 15 to Alibhai Declaration). In addition the letters are not hearsay because the Court is not considering them for the truth of the matter asserted, but simply as evidence whether Hyatt was on notice of the issues addressed in the letters and whether Hyatt was given an opportunity to cure.

[7] The payments are referred to for the first time as payments of "Base Debt." The distinction between Base Debt and "Owner's Remittance Amount" and the parties' conflicting interpretation of this distinction is discussed in more detail infra at 26-31.

GGF and Skopbank stating that they "consider the Management Agreement . . . as void, terminated and/or expired." The letter further demanded that Hyatt "comply with all demands in the March 1, 1995 default notice, . . . cooperate in an orderly transition to new management under the designee of 35 Acres, [and] immediately surrender control to 35 Acres Associates of all Hotel related accounts . . . ." (Ex. D-8.) Hyatt did not leave the hotel. Further detailed demand letters were sent on June 8, 1995, June 19, 1995, and July 13, 1995. (Exs. D-9, D-10, D-11 & D-12.) Hyatt still did not comply, cooperate or leave the hotel until this Court's order to vacate was affirmed in September of 1996 by the United States Court of Appeals for the Third Circuit. *GGF v. Hyatt*, 95 F.3d 291.

This Court finds that the letter of March 1, 1995, from Skopbank to Hyatt effectively put Hyatt on notice of its defaults and gave Hyatt an opportunity to cure. Hyatt's failure to cure the payment defaults within fifteen days thus constituted an "event of default" under the Management Agreement as defined in Section 12. Hyatt's right to remain as manager after the foreclosure hinged on it not being in default. The Subordination Agreement provided in relevant part that,

> so long as Hyatt is not in default (beyond any period given to Hyatt to cure such default) in the payment of amounts due or the performance of any of the other terms, covenants and conditions of the Management Agreement on Hyatt's part to be performed, the interest of Hyatt created by the Management Agreement, Hyatt's management of the hotel and all of its other rights under the Management Agreement shall remain undisturbed by any foreclosure or default under the Security Documents and shall be recognized by Lender and its permitted successors and assigns (the "Mortgagee") during the term of the Management Agreement . . . .

The March 1, 1995 letter demanded "forthwith" payments of Base Debt calculated from the certified financial reports for the years 1992 and 1993, and a full accounting of the hotel accounts from 1990 forward. Hyatt did not respond until after the judicial sale on March 21, 1995, and then simply stated that the March 1,

1995 letter "did not raise any new issues which were not asserted in prior correspondence or during settlement discussions." (Letter from Hyatt counsel to Skopbank counsel dated March 21, 1995, attached as Ex. H to Mot. Partial Summ. J.) Hyatt did not indicate that it would attempt to cure any of the defaults but only that it would "speak to [Skopbank's] allegations in its responses to the lawsuits." *Id.* When 35 Acres acquired the hotel on March 20, 1995, more than fifteen days had passed after the March 1st notice of default without Hyatt making any attempt to cure the defaults. Therefore, the new owner, 35 Acres, was not obliged to recognize the Management Agreement or to refrain from disturbing Hyatt's management of the hotel. Under these circumstances, 35 Acres' March 21, 1995 letter stating that it considered the Management Agreement void, terminated and/or expired was not a violation of that agreement.

Hyatt argues that all of the letters preceding the March 21, 1995 letter, including the March 1, 1995 letter, were defective notices of default because they were sent by Skopbank and not the owner of the hotel. Hyatt claims that only Great Cruz as a party to the Management Agreement had the right to send default notices and the power to terminate Hyatt, that Skopbank did not have the power to terminate the Management Agreement, and that Skopbank thus did not have the power to give any notices of default. Hyatt further contends that the previous owner, Great Cruz, had never sent any notices of default and had believed that Hyatt was acting appropriately in not making payments to Skopbank. (Response at 51.)

This Court finds that, while Skopbank as lender may not have had the power to terminate the Management Agreement, Skopbank as an assignee[8] of Great Cruz's right to receive payments had the right to notify Hyatt of Hyatt's defaults, at least with respect to Hyatt's obligation to remit money to Skopbank. Because Skopbank had the right to receive payments from the hotel funds

[8]Skopbank contends that it is a third party beneficiary of the Management Agreement. Hyatt argues that, while Skopbank is a third-party beneficiary to the Letter Agreement, it is merely an assignee of Great Cruz's rights to receive payment under the Management Agreement. The Court need not decide Skopbank's third party status because it finds that Great Cruz' assignment to Skopbank of its right to receive payment from Hyatt included the right to notify Hyatt of any default in making those payments.

under Hyatt's control, Skopbank was the appropriate party to notify Hyatt of Hyatt's defaults in making those payments. Moreover, the essential purpose of a notice provision is given effect so long as the defaulting party received actual notice and was given an opportunity to cure.[9] Thus Hyatt was effectively notified of its defaults in payment on March 1, 1995, and its failure to cure those defaults within fifteen days meant that Hyatt was "in default" as that term is used in the Subordination Agreement, which in turn released 35 Acres from the Management Agreement.

The conclusion that Skopbank was an appropriate party to notify Hyatt of its defaults in payments due is strengthened by the fact that Great Cruz no longer had any rights in the hotel or its operations as of March 1, 1995. Two weeks before the March 1st letter, Great Cruz had consented to the entry of a judgment of foreclosure in favor of Skopbank. The consent decree provided that, as of February 17, 1995, Great Cruz entities and personnel were "restrained from interfering in any way with Skopbank . . . with any of the property to be delivered to [Skopbank or its assigns] or with the operation thereof." (Consent Judgment, Ex. G to Mot. Partial Summ. J. at ¶ 81.) The consent decree further stated that Great Cruz "shall not interfere with the management of the Hotel . . ., shall not take any action which would interfere with the relationship between Skopbank and Hyatt, and shall not take any action in concert with Hyatt which would interfere with the operation of the [hotel]." (*Id.* at ¶ 82.) And finally Skopbank was allowed to "do all . . . things as may be necessary or convenient to facilitate transfer of title and to assure the continued and uninterrupted operation of the [hotel] . . . ." (*Id.* at ¶ 84.)

Clearly, on March 1, 1995, Skopbank was the entity with the power to make all decisions concerning the hotel. If Hyatt's

---

[9] *Cf Midwest Payment Systems, Inc. v. Citibank Federal Savings Bank,* 801 F. Supp. 9, 13-14 (S.D. Ohio 1992) ("'"the essential purpose of notice of default in the usual case is to give the party allegedly in default an opportunity to remedy the default and meet its obligation . . . . [therefore] notice is not required where a party has actual notice and has not suffered prejudice.'"') (citation omitted); *Dunkin Donuts, Inc. v. Towns Family, Inc.,* No. 95 C 3666, 1995 WL 591454 at *4 (Oct. 4, 1995, N.D. Ill.) ("A contracting party's technical, non-compliance with the precise requirements of a notice provision does not preclude that party from enforcing its rights under the contract if the intended recipient receives actual notice, because the non-compliance is not a material breach of the contract by the party providing notice.")

argument that Skopbank had no power to notify Hyatt of its defaults on March 1, 1995 could be correct, then there was no one in a position to notify Hyatt of its defaults. Hyatt would therefore have had no obligation to anyone under the Management Agreement and could have breached the agreement at will with impunity. Such an inequitable result would be unconscionable and cannot be countenanced. When Skopbank notified Hyatt on March 1, 1995 of its defaults, Hyatt was under a duty to cure the defaults or run the risk of being found 'in default' as of the transfer of ownership to 35 Acres.

### b. No liability under Section 12 at time of Hyatt's actual departure in September of 1996

■ Even accepting Hyatt's argument that all the letters from Skopbank before March 21, 1995 were defective, and that 35 Acres was bound by the Management Agreement when it took title to the hotel, as a matter of law Hyatt still can not prevail on its breach of contract claim. While the March 21, 1995 letter may not have been in strict compliance with Section 12, Hyatt suffered no damages as a result because Hyatt was not actually terminated and did not vacate the hotel premises on that date. By the time of Hyatt's actual termination in September of 1996, such termination was in accordance with Section 12, or, at the very least, technical compliance with Section 12 was excused under the circumstances.

Assuming that Hyatt was first properly notified of any defaults on March 21, 1995, when 35 Acres sent the termination letter, that letter was defective under Section 12 by not giving Hyatt a fifteen-day opportunity to cure. 35 Acres only had the right to send an intent to terminate letter under Section 12 fifteen days later if Hyatt had failed to cure, with termination to follow upon the passing of another fifteen days. If Hyatt had in fact been immediately terminated effective on that day, Hyatt would have had a breach of contract claim against 35 Acres, assuming the Management Agreement applied. However, Hyatt continued in possession and in active management of the hotel.

None of the cases cited by Hyatt purport to allow a claim for breach of a termination provision unless the agent was actually

terminated.[10] Hyatt's argument that it has a claim under Section 12 because this Court, the Court of Appeals for the Third Circuit, and the Skopbank Parties have stated that Hyatt's agency was "terminated" on March 21, 1995, is nothing short of ridiculous. All during this time, until it left in September of 1996, Hyatt vigorously and steadfastly asserted that it considered the Management Agreement to be in full force and effect. Hyatt cannot be heard to claim that the agency was "terminated" as of March 21, 1995, now that it suits its purposes to make a claim under Section 12 of the Management Agreement. Because Hyatt did not leave the hotel on March 21, 1995, the defective termination letter can have caused it no damages. Without suffering any damages, Hyatt has no cause of action for breach of contract. *Rexnord Holdings*, 21 F.3d at 525 (damages is a necessary element for breach of contract claim under New York law); *American Sales*, 71 Ohio App. 3d 168, 593 N.E.2d 316 (damages attributable to breach of contract necessary element for breach of contract claim under Ohio law). Hyatt arguably could have treated the March 21, 1995 letter as a repudiation of the Management Agreement, left the hotel, and sued for breach of contract.[11] However, Skopbank's technically deficient letter did not give Hyatt the right to stay as manager of the hotel and yet claim that Skopbank breached the Management Agreement based upon not complying with its Section 12 notice provisions.

Furthermore, Hyatt's actual termination in September of 1996 was in accordance with Section 12. Even though the March 21, 1995 letter may have been defective for purposes of immediately terminating Hyatt, it did serve to put Hyatt on notice of its defaults. Indeed, Hyatt received several more letters from the new owner, 35 Acres, detailing all of its defaults. Hyatt still made absolutely no attempt to cure any of these defaults during its continued possession and active management of the hotel until it departed in September of 1996.

---

[10] *Cain Partnership Ltd. v. First Nat'l. Bank of Louisville*, 996 F.2d 1214, 1993 WL 241448 (6th Cir. 1993) (lease was terminated without notice and an opportunity to cure lessor's defaults by bank); *KDI Corp. v. Gwinn*, 21 Bankr. 652 (S.D. Ohio 1982) (employee terminated without ten day notice and opportunity to cure alleged defaults); *Vardi v. Mutual Life Ins. Co. Of New York*, 136 A.D.2d 453, 523 N.Y.S.2d 95 (N.Y. App. Div. 1988) (employee terminated without thirty days notice).

[11] 6 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1266 at 64 (1962).

Even if the March 21 and later letters are considered improper notices of defaults despite being sent by the undisputed owner, 35 Acres, because of their failure to expressly state that they constituted such notices, Hyatt's claim must still fail. Hyatt consistently took the view that it was not in default and had no obligation to remit any monies to Skopbank. For example, in rejecting a demand for a payment of an owner's remittance, Hyatt stated that "[We] are retaining net operating revenues as a reserve for payment of renovation costs." (Letter dated August 13, 1993 from Hyatt to Skopbank, Ex. 20 to the Alibhai Declaration at 2.) More specifically in response to Skopbank's demands for payment of Base Debt, first asserted in the March 1, 1995 letter, Hyatt merely indicated that it would respond to Skopbank's requests in the litigation. Hyatt's position throughout this litigation has been that Hyatt was not in default of the Management Agreement and could not be terminated under the Management Agreement. Given that Hyatt manifested an intent not to comply with the Skopbank Parties' demands, the Skopbank Parties were excused from their obligation to send notices in strict technical compliance with Section 12.[12]

Having concluded that the Skopbank Parties' failure to comply with Section 12 alone is not sufficient to prevail on a claim for breach of contract, the Court next addresses whether Hyatt has put forth enough evidence to raise a genuine issue of material fact concerning Hyatt's performance of its obligations under the Management Agreement.

---

[12] Skopbank argues that because the failure to pay money due Skopbank was a material breach as a matter of law, Skopbank could not be found liable for failure to comply with Section 12 of the Management Agreement. There is authority for the proposition that failure to comply with a termination provision constitutes a breach, even in the face of a material breach by the other side. Such a breach may be immaterial and may only entitle the other side to nominal damages, but it still constitutes a breach. 6 LAWRENCE A. CUNNINGHAM & ARTHUR J. JACOBSON, CORBIN ON CONTRACTS, § 1266 at 26 (Supp. 1997). Accordingly, this Court rests its decision (assuming the Management Agreement applied to 35 Acres) upon the finding that (1) the alleged "breach" on March 21, 1995, caused no damages to Hyatt because Hyatt continued acting as manager, and (2) that the termination in September of 1996 was not in violation of Section 12, or, in the alternative, that compliance with Section 12 was excused as of September of 1996 under the circumstances.

## 2. Failure to Pay Base Debt

■ The Skopbank Parties claim that Hyatt was obligated under the Management Agreement and the Letter Agreement to remit payments to Skopbank. The Skopbank Parties base this claim on their reading of the relevant contractual provisions and the certified financial statements of the hotel which show that money was available for payment.[13] Hyatt argues: (1) that it had no obligation to make any payments to Skopbank; (2) that Hyatt's obligation was discharged by the payment of $8.77 million out of hotel operating accounts pursuant to court orders in the foreclosure action that benefitted Skopbank directly or indirectly; (3) that Great Cruz's defaults under the Management Agreement and Skopbank's defaults under the Guaranty excused Hyatt's obligation to make any payments; and (4) that Great Cruz waived Hyatt's defaults. Significantly, Hyatt does not dispute the accountants' reports which show positive Hotel Cash Flow from 1992 onward. Hyatt also makes no claim that any of the contractual provisions are ambiguous.

### a. The March 1990 agreements mandated payment of base debt

The relevant contractual provisions are as follows. The Letter Agreement stated that "all sums due and payable from time to time to Great Cruz pursuant to the Management Agreement shall

---

[13] In Hyatt's Motion to Strike, Hyatt complains that Exhibits E-1 through E-4, which consist of the certified financial statements prepared by Coopers & Lybrand for Hyatt for the years ending 1992 & 1993 (one report), 1994 & 1995 (one report), 1990 and 1991, are unauthenticated and inadmissible hearsay and thus should be stricken. The Court has not stricken the reports, because, for starters, Hyatt has not contended that the reports are in fact not authentic. The certified financial reports for 1990 through 1994 were referred to (but not attached) in paragraphs 114 - 118 of the Skopbank Parties' First Amended Complaint. Hyatt, in its Answer, acknowledged them by stating that the "financial statements referenced in [paragraphs 114-118] speak for themselves." (Answer at 13.) In addition, the Skopbank Parties have attached to their Reply the depositions of various persons, including an employee from Coopers & Lybrand, and Hyatt employees, including the controller, during the relevant period, who sufficiently authenticated the reports. (Borg. Dep. 2/21/97 at 64-67, 72-77, 91-94, 111-112, Borg Dep. 1/10/97 at 268-69 at Tab 6 of Reply Appendix; McDaniel Dep.1/23/97 at 41-53, 78-84, 87-88, Tab 12 of Reply Appendix; Figueroa Dep. 8/19/96 at 43-45, 102-103, 106-110, Tab 10 of Reply Appendix.) In addition, the reports do not constitute inadmissible hearsay as they fall within the business records exception to the hearsay rule. FED.R.EVID. 803(6).

be paid directly to [Skopbank] . . . ." Section 4.6 of the Management Agreement, entitled "Priorities of Payment," provided that

> in any fiscal year in which there shall be a positive amount of Hotel Cash Flow, such amount (anything in this Agreement to the contrary notwithstanding) shall be applied in the following order of priority:
>
> (a) to Hyatt, in payment of Incentive Fees earned for that fiscal year;
>
> (b) to Owner, an amount equal to the Base Debt for such fiscal year;
>
> (c) to Hyatt, in payment of the amount of Additional Fees earned for such fiscal year;
>
> (d) to Hyatt in payment of the principal of and interest on Hyatt Loans . . . . ; and
>
> (e) any remaining balance to Owner as Owner's Remittance Amounts pursuant to Section 4.3 above, less deductions for such amounts as Hyatt shall be entitled to deduct in calculating Owner's remittance amounts.

(Management Agreement at 40.) The term "Hotel Cash Flow" is defined as the gross operating profit less deductions for such costs as Hyatt's basic fee, insurance, real and personal property taxes, etc. (Management Agreement, § 5.2 at 44-45.) At the end of each fiscal year, Hyatt was obligated to provide a certified financial statement which set forth the Hotel Cash Flow amount among other items. (*Id.*, § 7.4 at 54-55.)

Hyatt's Incentive Fee was an amount equal to eight (8%) of the Hotel Cash Flow up to one million dollars ($1,000,000) of such Hotel Cash Flow, increasing by .one percent (1%) for each additional one million dollars. (*Id.*, § 4.2.1 at 25-26.) Hyatt's Additional Fee was a percentage of Hotel Cash Flow that exceeded Base Debt. (*Id.*, § 4.2.1(c).) Base Debt was defined as "an amount equal to Four Million Dollars" plus an additional amount determined by a formula related to room occupancy. (*Id.*, § 4.2.1. at 26-27.) Owner's Remittance Amounts were defined as "an amount . . . by which the total funds then in the operating accounts exceed the amount then required, in Hyatt's opinion, to be maintained in the operating accounts . . . in order to carry on the operation of the Hotel

pursuant to a first-class standard . . . ." (*Id.*, § 4.3.) Section 4.3 went on to state that "Owner acknowledges and agrees that until completion of the Renovation Program it is possible that substantially all net operating revenues shall be retained as a reserve to pay renovation costs and operating expenses." *Id.*

The certified financial statements showed a positive Hotel Cash Flow for the years 1992, 1993, 1994 and 1995. (See Exs. E-1 to E-4 to Mot. Partial Summ. J.) The amounts were as follows: $3,344,000 in 1992; $4,236,973 in 1993; $4,398,323 in 1994; and $899,376 in 1995. (*Id.*; Uncontested Fact No. 25.) As authorized by Section 4.6, Hyatt paid itself Incentive Fees in the following amounts: $307,840 in 1992; $408,437 in 1993; $427,799 in 1994; and $71,150 in 1995. (Exs. E-1 to E-4; Borg Dep.1/21/97 at 93-94, tab 6 of Reply Appendix.) No payment of Base Debt was ever remitted to Skopbank.[14]

Hyatt would have this Court read Section 4.6 as not mandating payment of Base Debt any time there is positive Hotel Cash Flow. Hyatt asserts that Section 4.6 "only governed the rights to payment as between Hyatt and Owner. It [did] not purport to address the parties' respective *obligations of payment* to each other." (Response at 48.) Hyatt further argues that it was only obligated to make payment to the owner after Hyatt management was satisfied that

---

[14] Skopbank relies on an affidavit from Michael Stanton, Senior Vice President of Skopbank in charge of the loans for which the hotel is collateral, who states that no payments of Base Debt or Owner's Remittance Amounts were ever made. (Stanton Aff., Ex. B. to Mot. Partial Summ. J. at ¶ 3) In Hyatt's Motion to Strike, Hyatt claims that the Court should not consider Stanton's affidavit because he "fails to indicate that he has personal knowledge of each of the matters set forth therein." (Motion to Strike at 6.) Hyatt is particularly concerned with the "conclusory statement" that the hotel never made a single payment of Base Debt or Owner's Remittance Amounts to Skopbank or 35 Acres. *Id.* The Court has not stricken Stanton's affidavit. A corporate representative speaks from personal knowledge about information which is generally within the purview of his job. *See, e.g. Boyle v. Turnage*, 798 F.2d 549, 551 (1st Cir. 1986); *Thoma v. Wolverine World Wide, Inc.*, 352 F. Supp. 580, 582 (W.D.Pa. 1972) (affidavit of treasurer of defendant corporation admissible to show that no year-end bonus was in fact paid to any of the corporation's employees.) Moreover, Hyatt sets forth no facts to demonstrate that Stanton did not have personal knowledge. *Catawba Indian Tribe v. State of South Carolina*, 978 F.2d 1334, 1342 (4th Cir. 1992) (corporate officer ordinarily possess personal knowledge of acts of corporation and in absence of proof of no personal knowledge, the personal knowledge element is satisfied). Finally, Hyatt does not dispute the truth of the statement that Base Debt was never paid, and in fact this statement is supported by the deposition testimony of Hyatt representatives. (McDaniel Dep.1/23/97 at 34, 53, 82, 87-88, Tab 12 of Reply Appendix; Wright Dep. 2/12/97 at 40, 45, Tab 8 of Reply Appendix.)

there was sufficient money in the hotel accounts to fund the renovation program and to operate the hotel according to a first-class standard, relying on Section 4.3 of the Management Agreement. Hyatt claims that Section 4.3, entitled "Remittances to Owner," included payments of "Base Debt" and "owner's remittances" because Base Debt was just one aspect of Owner's Remittance Amounts. Hyatt states that, under Section 4.3, it had the unfettered discretion to "both apply and reserve amounts within the Hotel Operating Accounts sufficient to complete the Renovation Program and maintain the Hotel in accordance with a first-class hotel standard." (Response at 50.)

Hyatt particularly notes the sentence in Section 4.3 concerning the possibility of all "net operating revenues" being retained as a reserve to pay renovation costs and operating expenses. Hyatt claims that this is what happened, i.e. that all revenues were maintained as reserve pursuant to Section 4.3. Hyatt claims that before March 21, 1995,

> the balances maintained by Hyatt in the Hotel operating accounts were no more (and were, frequently, less) than the amounts Hyatt determined, in its professional opinion, to be necessary to ensure that the Hotel could be operated and maintained in accordance with a first-class hotel standard, that the Renovation Program could be fully funded and completed, that sufficient working capital funds were on hand to ensure the uninterrupted and efficient operation of the Hotel at all times, the full and timely payment of all operating expenses of the Hotel, and the otherwise satisfaction of the obligations of both the Owner and Hyatt under the Management Agreement and Transition Agreement.

(Response at 51.)[15]

---

[15] Hyatt submitted several affidavits from Hyatt and Great Cruz principals involved with the hotel who stated their understanding that no payments would be due to Skopbank until after the renovation program was completed. (*See, e.g.* Aff. David Allen at 1, Declaration of Michael Shindler at 5, Declaration of Laurence Geller at 5-8, attached to Notice of Response of Hyatt Corp. To Mot. Partial Summ. J.) Skopbank objects to this evidence as violative of the parol evidence rule, because it seeks to alter the plain

The Court finds that the March 1990 Agreements are unambiguous and simply do not support Hyatt's interpretation. While Section 4.3 did accord Hyatt the right to withhold payments of Owner's Remittance Amounts if Hyatt determined that it needed to keep the money in reserve to pay for the renovation and operating expenses, Section 4.3 did not bestow such a right to withhold the payment of Base Debt. Base Debt and Owner's Remittance Amounts are clearly separate categories of payment obligation under Section 4.6. They were separately defined, and they were accorded a separate priority of payment. The Management Agreement unambiguously provided that, in the event of positive Hotel Cash Flow, the owner was to receive a payment of Base Debt after Hyatt paid itself its Incentive Fee. (Management Agreement, § 4.6.) The hotel generated positive Hotel Cash Flow for the years 1992, 1993, 1994 and 1995, and Hyatt paid itself Incentive Fees for these years. Hyatt was therefore obligated under the Management Agreement and Letter Agreement to make Base Debt payments to Skopbank for those same years of positive Hotel Cash Flow. Hyatt's failure to make any such payments of Base Debt whatsoever was a material breach, which thoroughly justified Hyatt's termination after notice and opportunity to cure, unless this obligation was discharged or excused.

 b. Court ordered payments of $8.77 million did not discharge Hyatt's obligations

■ Hyatt contends that because it paid over $8.77 million on Skopbank's behalf, such payments should now be characterized as payments of Base Debt. It should be obvious, however, that a payment under judicial compulsion can hardly constitute good faith performance and payment under a contract, nor can it excuse or cure Hyatt's payment defaults. At most, such payments may go

---

language of the March 1990 agreements. (Br. Supp. Pl's Mot. Strike Affs. & Declarations submitted by Hyatt in Opp'n to Pl's Mot. Partial Summ. J. on Basis of Parol Evidence Rule, Mot. in Limine to Exclude Evid. at Trial; & alternatively, Mot. to Reopen Discovery if Parol Evid. is not Excluded.) The Court has not stricken any of the affidavits, but notes that none of these principals have alleged that the provisions of the March 1990 Agreements are ambiguous. The Hyatt affidavits rather put forth a particular interpretation of those provisions. The Court finds the March 1990 Agreements to be unambiguous and that Hyatt's proffered interpretation is not supported by the plain language of the March 1990 Agreements.

to offset any damages which might be awarded to Skopbank. Such payments cannot and did not discharge Hyatt's obligations to pay Skopbank Base Debt under the March 1990 Agreements.

In 1995, during the settlement of the foreclosure action between Skopbank and Great Cruz, Skopbank for some reason agreed to pay $5.4 million to Great Cruz. Hyatt was ordered by this Court to release $5.4 million from the hotel operating accounts to Great Cruz. (Response at 65.) Hyatt here claims that this payment directly benefitted the Skopbank Parties who were then able to foreclose on the hotel without delay. Michael Stanton, Senior Vice President of Skopbank responsible for the loans for which the hotel was collateral, testified in deposition that he did not deem such payments to be classified as Owner's Remittance Amounts or a payment of Base Debt. (Stanton Dep.1/20/97 at 191-92, Ex. 2 to Declaration of Jamil N. Alibhai in Opp'n to Mot. Partial Summ. J. ["Alibhai Declaration"].)

Hyatt argues that the $5.4 million should now be recharacterized and credited as a payment of Base Debt and/or Owner's Remittance Amount and attempts to rely on several deposition statements as support. In response to the question why he believed that the $5.4 million in the hotel accounts was the owner's money, a Skopbank representative stated that, "because we had reviewed the Coopers and Lybrand audit . . . which showed that there were monies that ought to have been used to pay the base debt. . . ." (Response at 64.)[16] Further, Hyatt claims that Skopbank was uncertain how to book the payment of $5.4 million. (*Id.* at 66.)

Even if the Court were to agree with Hyatt's argument that the $5.4 million directly benefitted Skopbank and should have been credited as payments of Base Debt, the Court still could not find that the payment discharged Hyatt's contractual obligation to pay Base Debt. According to the certified financial statements, an amount significantly greater than $5.4 million was due as payment of Base Debt. Moreover, if the payment had been characterized as payment of Base Debt, that would simply highlight Hyatt's

[16] In Hyatt's Response there is no citation for these deposition excerpts allegedly made by Aki Salmi, a member of the Skopbank Board of Management. While some excerpts are attached as exhibit 24 to the Alibhai Declaration, Hyatt omits the relevant portion quoted in its Response.

obligation to make such payments and its failure to do so until required by this Court's order. If the failure voluntarily to remit monies to Skopbank before February of 1995 constituted a breach of Hyatt's obligations, Hyatt's release of hotel funds only under the compulsion of a court order did not extinguish or excuse that breach, although it may affect the calculation of damages, if any due to Skopbank.

The same analysis applies to Hyatt's payment by court order of insurance premiums in 1993 and 1994. Hyatt maintains that it had no obligation under the Management Agreement to pay for property insurance which was the obligation of the owner. (Response at 67.) Hyatt was ordered by Judge Brotman to pay insurance premiums in excess of three million dollars, which premiums covered the hotel and the Villas property. Hyatt here argues that such payments were "to and for the benefit of Skopbank." (*Id.* at 70.) Again, Skopbank's failure to account for such payments as credit towards Base Debt or Owner's Remittances Amounts did not negate Hyatt's breach, but rather simply may affect the calculation of damages.

### c. Prior alleged defaults by Great Cruz and Skopbank did not excuse Hyatt's nonpayment of base debt

■ Hyatt asserts that because Great Cruz and Skopbank had materially defaulted on their obligations to Hyatt, Hyatt was excused from making Base Debt payments. The Court agrees that a material breach (by Great Cruz or Skopbank) would have entitled the non-breaching party (Hyatt) to rescind a contract and suspend its own performance. However, the non-breaching party would not be entitled to continue to reap the benefits of the contract while at the same time failing to perform its obligations under the contract. Accordingly, while the alleged breach of Great Cruz or Skopbank might have given Hyatt the right to terminate the Management Agreement and leave the hotel, it did not entitle Hyatt to continue acting as manager and at the same time withhold Base Debt payments.

Hyatt asserts that the former owner's defaults "legally entitled Hyatt to suspend its performance under the Management Agreement pending the Owner's performance." (Brief of Hyatt in Opp'n

to Mot. Partial Summ. J. of Skopbank & 35 Acres & in Supp. of Hyatt's Request for Judgment ["Brief"] at 26.) Great Cruz' alleged defaults include: (a) the obligation to approve Hyatt's proposed Renovation Program for the Hotel; (b) the obligation to implement the Renovation Program; (c) the obligation to timely provide working capital as requested by Hyatt; (d) the obligation not to engage in the unauthorized withdrawal of hotel funds; (e) the obligation not to interfere with Hyatt's establishment of hotel accounts; and (f) the obligation not to divert or withhold money which should be deposited into and maintained in the hotel accounts. (*Id.* at 25-26.) Hyatt also argues that Skopbank defaulted in its obligations to Hyatt under the Guaranty by not funding all of Hyatt's working capital and renovation cost requests. (*Id.* at 85-89.)

Hyatt sent numerous letters concerning the above defaults (*Id.* at 83-85, 88, 89, 91-92), the latest dated February 23, 1993. (*Id.* at 85.) Indeed, Hyatt claims that an "event of default" existed pursuant to Section 12 of the Management Agreement with respect to the Renovation Program, presumably entitling Hyatt to terminate the agreement. (*Id.*) Inexorably, the Court returns to the fact that Hyatt did not exercise this right to terminate the Management Agreement. Because Hyatt continued to reap the benefits of the Management Agreement, i.e. by paying itself management fees and continuing to run the hotel, Hyatt was obligated to continue performing its promises under the March 1990 Agreements, including the obligation to pay Base Debt.

Two New York cases are illustrative of this point. *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. at 667; *V.S. International, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188 (S.D.N.Y. 1994). In *Alesayi* the court stated the relevant law:

> When a party materially breaches, it has failed to substantially perform the contract and the other party is discharged from performing its obligations. The power to terminate a contract following breach is one of election. The non-breaching party faces two options: it may either continue to perform under the contract or it may terminate the contract. If the non-breaching party elects to continue performance, it may not later choose to terminate the contract on account of the breach. However, the

> non-breaching party may sue later for breach, even though it elected to continue to perform rather than terminate the agreement, if notice of the breach was given to the breaching party. ·

*Id.* (citations omitted). Treating Hyatt for this limited purpose as the "non-breaching" party, Hyatt elected to continue performance and thus was obligated to make Base Debt payments, regardless of whether it could sue for alleged breaches at a later time.

In *Boyden*, a licensee of a trade name brought an action for breach of the license agreement's exclusivity provision, and the licensor counterclaimed for breach of contract. 862 F. Supp. at 1188. When the licensor breached the exclusivity provision, the· licensee withheld the payment of license fees, but otherwise continued acting as a licensee under the agreement. The court found that "the conduct engaged in by [the licensor] would have . . . been sufficient grounds for [the licensee] to have terminated the contract and sued for total breach, or at the very least to have invoked the default provision of the Agreement . . . ." *Id.* at 1196. However, the licensee

> never attempted to terminate the agreement, either by exercising the default provision . . . , or by terminating the Agreement·based on [licensor's] breach. Accordingly, the agreement remained ,in effect until the [licensor] terminated it . . . as provided in the termination clause. Even viewing [licensee's] written correspondence to [licensor] as [licensee's] giving notice to [licensor], and giving it an opportunity to cure the breach, [licensee] never terminated the agreement, and did not bring the instant action until after [licensor] terminated the agreement.

*Id.* Thus, the court held that the licensee's "refusal to perform [its] end of the bargain by making the requisite licensing payments, was impermissible," rendering the termination of the Agreement by licensor appropriate. *Id.* at 1197. *See also McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F. Supp. 401, 403-04 (W.D.N.Y. 1986) (notwithstanding alleged breach by plaintiff, defendant's failure to

make periodic payments constituted breach when defendant accepted benefits of contract).

Hyatt is in the same position as the licensee in Boyden. Hyatt was not excused from meeting its obligations under the agreements despite any alleged breaches by Great Cruz or Skopbank, because Hyatt continued to act as manager of the hotel and to reap the benefits of the Management Agreement. None of the cases cited by Hyatt involve facts where the non-breaching party, in spite of the alleged breaches by the other side, continued to reap the benefits of the contract.[17]

Hyatt suggested at oral argument that the breaches of Great Cruz and Skopbank in their respective payment obligations to Hyatt would offset Hyatt's obligation to make payments to Skopbank. (Transcript, Mar. 12, 1997 ["Tr."] at 51.) Even assuming this argument has merit, the amounts of money Hyatt claims Great Cruz or Skopbank failed to pay pale into insignificance next to the amount of Base Debt owed to Skopbank. Hyatt claims that in 1991 Great Cruz breached its obligation to provide sufficient working capital, and Hyatt then requested payment from Skopbank under the Guaranty. The amount requested was $1,000,000, which Hyatt acknowledged "slightly exceeds the available remainder under the working capital guarantee . . . ." (Letter dated Oct. 24, 1991 from Hyatt to Skopbank, Ex. 46 to Alibhai Declaration.) It is undisputed that Skopbank advanced at least $350,000.[18] (Response at 88; Reply at 63.) Under the renovation portion of the Guaranty, Skopbank refused to fund renovation costs in the amount of approximately $212,000 incurred from October of 1992 to November of 1993. (Wright Dep. 1/31/97 at 270-73, Wright Dep. 2/13/97 at 333-35

---

[17] I.e., Jafari v. Wally Findlay Galleries, 741 F. Supp. 64 (S.D.N.Y. 1990) (seller excused from selling painting to plaintiff when plaintiff materially breached the contract by failing to tender payment at a reasonable time); Zim Israel Navigation Co. v. Indonesian Exports Dev. Corp., No. 91 Civ. 3848 (CSH), 1993 WL 88223, * 2 (S.D.N.Y. March 24, 1993) (stating general rule that material breach excuses non-performance by non-breaching party and holding that under the expired contract, plaintiff's breach was immaterial and thus did not excuse plaintiff's non-performance of contractual obligation); United States v. 0.35 of an Acre of Land, 706 F. Supp. 1064, 1074 (S.D.N.Y. 1988) (in action seeking specific performance of real estate contract, there was no material breach on part of United States excusing defendants' duty to sell).

[18] Skopbank claims that after the initial request for one million dollars, Hyatt reduced its request to $500,000, which Skopbank subsequently fully funded by two installments of $350,000 and $150,000. (Reply at 61-63.) See discussion infra at 47-49.

321

and accompanying Exs., Tab 8 to Reply Appendix.) Correspondence indicates that Skopbank refused to fund the request because of a dispute over the collection of bills owed to the hotel from Great Cruz entities, including the Villas property. (Letter dated Nov. 19, 1992 from Skopbank to Hyatt, attached to Wright Dep. 1/31/97 at Tab 8 of Reply Appendix.) Assuming Skopbank's refusal to fund the renovation expense and the full one million dollar working capital request was unjustified, the total amount of approximately $850,000 does not offset to any substantial degree the over ten million dollars owed as Base Debt payments.[19]

A similar analysis applies with respect to the breach by Great Cruz when it wrongfully withdrew approximately $500,000 from the hotel funds. Skopbank argues that the withdrawal was a result of Hyatt's negligence in not setting up new bank accounts when it took over management of the hotel, which Skopbank alleges was required by Section 3.3 of the Management Agreement.[20] Hyatt uses these events as additional support for its argument that Great Cruz, as owner, breached the Management Agreement, which justified Hyatt's failure to fulfill all of its obligations. Hyatt points to sections of the Management Agreement giving Hyatt exclusive control over operation of the hotel and operating accounts to show that Great Cruz's actions constituted a breach. (Response at 89, citing §§ 3.1, 3.3 of Management Agreement.) Assuming Hyatt was not at fault and did not contribute to Great Cruz's actions, and assuming that Great Cruz's breaches could impact on Skopbank's rights, the $500,000 withdrawal would still only justify nonpayment of Base Debt up to $500,000. Indeed, totaling all of the

---

[19] The certified financial statements show that the positive Hotel Cash Flow for the years 1992, 1993, and 1994 totaled $11,979,296. After payment of the incentive fee, the excess should have been paid towards Base Debt. The incentive fees paid totaled $1,144,076. Accordingly, at least $10,835,220 should have been paid towards Base Debt for those years. (Exs. E-1 to E-4 of Mot. Partial Summ. J.; *see also* Tr. at 13-14.)

[20] Section 3.3 of the Management Agreement states in pertinent part:

There shall be deposited in a bank or banks designated by Hyatt and in accounts established in Owner's name all monies advanced to the Hotel as working capital by Owner, . . . and all monies received by Hyatt from the operations of the Hotel ("operating accounts") . . . . Checks or other documents of withdrawal drawn upon the operating accounts shall be signed by representatives of Hyatt or Hotel employees designated by Hyatt, as agent for Owner, which persons drawing on such accounts shall be bonded or otherwise insured.

amounts Hyatt claims were not provided to it and the amounts wrongfully withdrawn from the hotel accounts only comes to approximately $1,350,000. Such an amount still does not come close to the amounts indisputably owed as Base Debt according to the hotel cash flow generated by the hotel.

> d. Skopbank and 35 Acres were not bound by former owner's waiver of Hyatt's defaults

 Hyatt argues that "prior to the date it lost title to the Hotel, March 21, 1995, Great Cruz did not believe that Hyatt was in material breach of any provisions of the Management Agreement or Transition Agreement between the parties." (Response at 79.) Hyatt suggests that this raises a genuine issue of material fact regarding the owner's waiver of any Hyatt breaches and that Skopbank would be bound by such a waiver because of a provision in the Guaranty. However, both Hyatt and Great Cruz were aware that the right to receive payments of Base Debt had been assigned in the Letter Agreement to Skopbank. An assignor cannot later waive the obligor's duty to the assignee. RESTATEMENT (SECOND) CONTRACTS, § 338 (1) (assignor has no "power to discharge or modify the duty' of the obligor . . . after the obligor receives notification that the right has been assigned and that performance is to be rendered to the assignee.") Thus, Great Cruz did not have the authority to waive or release Hyatt's obligation to make payments of Base Debt to Skopbank without the consent of Skopbank.

The provision under the Guaranty cited by Hyatt is irrelevant. Under the Guaranty, Skopbank agreed that "any consents, approvals or waivers given by the Owner under the provisions of the Management Agreement or the Transition Agreement . . . shall be fully binding on both Owner and Lender, and may be relied upon by Hyatt, without notice to or approval of Lender." (Guaranty at 7.) This provision means that Skopbank could not refuse to make payments to Hyatt under the Guaranty based on defaults by Hyatt waived by Great Cruz. Any alleged waiver by Great Cruz of Hyatt's failure to make Base Debt payments simply would prevent Skopbank from using such a default as an excuse not to make a payment under the Guaranty. By agreeing to this provision in the

Guaranty, however, Skopbank did not agree to be bound by Great Cruz's waivers for all purposes. Skopbank had rights assigned by Great Cruz under the Management Agreement, including a right to Base Debt payments. These rights could not be unilaterally waived by Great Cruz.

### 3. Other Alleged Breaches by Hyatt

In its summary judgment motion, Skopbank also alleges that Hyatt "breached its obligation to Skopbank to "faithfully comply' with the Management Agreement by allowing millions of dollars of Hotel funds to dissipate to Great Cruz and its affiliates . . . ." (Mem. Supp. Mot. Partial Summ. J. at 13.) The "dissipation of hotel funds" refers to both the wrongful withdrawal of $500,000 by principals of Great Cruz, and the noncollection of payments for services and supplies provided to the Villas by the hotel. Skopbank also alleges that "Hyatt consistently refused to supply Skopbank and then 35 Acres with information relating to Skopbank's collateral and 35 Acres' property." (*Id.* at 21.) Because this Court finds that Hyatt was properly terminated because of its failure to cure its defaults related to the payment of Base Debt, the Court need not reach the issue of whether the other conduct of Hyatt constituted a default under the Management Agreement. Moreover, it appears that there are issues of fact concerning whether this conduct amounted to a breach on Hyatt's part, and the Court declines to find that such conduct constituted a breach of the March 1990 Agreements as a matter of law.

### 4. Hyatt's Termination Not in "Bad Faith"

■ Hyatt contends that there are genuine issues of material fact concerning whether Skopbank and 35 Acres breached an implied covenant of good faith and fair dealing. Hyatt cites cases where courts have imposed a duty upon a principal to only terminate an agency in good faith and not merely to escape payment to that agent. *Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1086-88 (S.D. Ohio 1992); *Smith v. Schoner*, 94 Ohio App. 308, 115 N.E.2d 25, 27 (Ohio App. 1953). However, these cases concern situations where the principal had the right to terminate the agent at any time. In our situation, the Management Agreement and the

Subordination Agreement provide that Hyatt could not be terminated unless it was in default as defined in the Management Agreement.

Hyatt claims that before entering into the March 1990 Agreements, Skopbank formed an intention to take over the hotel and sell it to a third party, and thus needed to hire a professional management company to improve the hotel's financial performance to make the hotel more marketable. (Brief at 27.) However, it is irrelevant that Skopbank had discussed plans concerning making the hotel more profitable and thus more marketable to potential buyers by finding a successful management company to run the hotel. Nor is it relevant that Skopbank in 1989 was "aiming for an agreement, which is easy to cancel in connection with selling the property . . ." or that Skopbank observed that a "long term management agreement on a fee basis may reduce a circle of possible investors." (Response at 96-97.) The fact of the matter is that when Hyatt entered into the agreements with Skopbank, Hyatt successfully negotiated terms which provided that Hyatt could only be terminated if it was in default, and which provided that Hyatt could continue to manage the hotel even after a foreclosure sale so long as Hyatt was not in default. As the Court of Appeals for the Third Circuit observed, "Hyatt's seeking of this subordination agreement indicates impressive foresight on its part . . . ." 75 F.3d at 307. However, the undisputed evidence demonstrates that Hyatt defaulted on its obligations under the March 1990 agreements and thus was properly terminated. Such a termination cannot be construed as a breach of the implied duty of good faith and fair dealing.

*D. Breach of Guaranty*

■ Hyatt alleges in its tenth count that Skopbank breached its obligations under the Guaranty. Under the Guaranty, Skopbank had agreed to "guaranty the payment and performance by Owner of its financial obligations under the Management Agreement and the Transition Agreement," subject to certain limitations. (Guaranty at 2.) The obligations included paying for renovation costs and providing working capital. Hyatt's claim must fail because Hyatt can prove no damages as a result of the alleged breaches.

As set forth in Hyatt's Response and discussed briefly above, the breach by Skopbank allegedly consisted of: (1) failure to fund the full amount of a $1,000,000 request for working capital by Hyatt in October of 1991; (2) repudiation of the Guaranty in July of 1992; and (3) refusal to fund approximately $200,000 for renovation costs requested by Hyatt in November of 1992. (Response at 85-88, 92-94.) Skopbank argues that it substantially complied with its obligations under the Guaranty by funding all of the working capital requests as revised, and by funding 94% of the renovation requests. Even assuming Skopbank substantially complied and its breaches were immaterial, an immaterial breach is still a breach. However, Hyatt's claim must fail because the undisputed facts show no damages to Hyatt as a result of Skopbank's alleged breaches.

### 1. Failure to Fund Working Capital Request

As discussed above, Hyatt requested a working capital advance of $1,000,000 in October of 1991. (Letter dated Oct. 24, 1991 from Hyatt to Skopbank, Ex. 46 to Alibhai Declaration ["October letter"].) Hyatt admitted that the request "slightly exceeded" the amount Skopbank was obligated to pay under the Guaranty. *Id.* According to Hyatt, Skopbank only paid $350,000 of that request. However, Skopbank, in its Reply, demonstrates that Hyatt in November of 1991 revised its request to $500,000, of which Skopbank paid the entire amount in two installments of $350,000 and $150,000. (Reply at 61-63.)

The purpose of the October 1991 working capital request of $1,000,000 was to enable Hyatt "to get to the end of the year with an appropriate (if not low) cash working capital cushion at the Hotel level." (October letter at 1.) The October request was made with the assumption that Hyatt would not use any advance deposits it received from its central reservations office in Omaha as working capital to help pay the Hotel's current expenses. The one million dollar figure was also based on Hyatt's projections of cash flow for the remainder of 1991. On November 15, 1991, Hyatt's working capital request was modified, presumably because of Skopbank's response. (Letter dated Nov. 15, 1991 from Hyatt to Skopbank, Ex. 78 to Lopez Dep. 1/31/97 at Tab 9 of Appendix.)

The modification included using all of the Omaha advanced deposits for operation of the Hotel, thus resulting in a smaller amount required from Skopbank. Accordingly, Hyatt indicated that $500,000 would probably suffice to "carry the Hotel beyond the current crisis." (*Id.*)

The only way that Hyatt could have been damaged by Skopbank's refusal to pay one million dollars is if in fact $500,000 did not suffice to carry the hotel through its cash flow crisis, and Hyatt was therefore forced to use its own money to meet the hotel's obligations. Hyatt has pointed to nothing in the record that shows that Hyatt had to advance its own money because of a cash flow shortage caused by insufficient working capital on hand. The only loan made by Hyatt to the hotel was for $200,000 in the summer of 1992 after the wrongful withdrawal of $194,000 by Great Cruz.[21] As admitted by Hyatt executives, this loan was repaid out of available cash from the hotel accounts approximately one month later.[22] (Borg. Dep.1/27/97 at 16-18., Tab 6 to Reply Appendix.) Indeed, the certified financial statements indicate that for the year ended December 31, 1992, there was cash and cash equivalents in the hotel accounts of over $1,200,000. (Ex. E-1 to Mot. Partial Summ. J. at 4.)[23]

2. "Repudiation" and Failure to Pay All Renovation Funding Requests

As referred to above, in June of 1992, one of the principals of

---

[21] The July 29, 1992 letter from a Hyatt executive to counsel for Skopbank, states that, "even though it was under no obligation to do so following the Owner's theft, Hyatt advanced funds to the Hotel to enable it to meet its obligations. This advance resulted in great benefit [to] the Hotel . . . . Furthermore, the advance of funds exceeded the amount stolen." (Letter dated July 29, 1992, Ex. 54 to Alibhai Declaration.)

[22] Skopbank argues that the fact that the loan was repaid out of positive hotel cash flow is indeed another indication that Hyatt breached its Base Debt obligations. Under Section 4.6 of the Management Agreement, Base Debt was to be paid before any loans from Hyatt were repaid. (Reply at 54.)

[23] In one of the explanatory notes in the statement, it is stated that $964,543 of the cash and cash equivalents was restricted cash representing advance deposits held for future guests. (Ex. E-1 to Mot. Partial Summ. J. at 5.) Evidence that the hotel was over any cash flow problems can also be found in the deposition testimony of Delroy Wright, the controller in 1993, who stated that 1993 was a financially successful year with no need for any "cash calls" (i.e. requests for working capital) to be made. (Wright Dep. 2/12/97 at 269-270.)

327

Great Cruz wrongfully withdrew $194,000 from the hotel accounts. Hyatt subsequently switched the accounts so that principals of Great Cruz would no longer have access to the hotel's money (something Skopbank contends Hyatt should have done when it took over management in March of 1990). Nevertheless, in July of 1992, $350,000 was improperly wired to the old hotel account to which Great Cruz had access, all of which was apparently withdrawn by principals of Great Cruz.[24] Because the wire transfer company had committed the error, the company immediately wired an equal amount to the proper account controlled exclusively by Hyatt.[25] On July 24, 1992 counsel for Skopbank wrote to Hyatt and declared that as a result of the events surrounding the $194,000 withdrawal and the $350,000 error, Skopbank "considered that it is not required to perform its obligations under the Guaranty." (Ex. 53 to Alibhai Declaration.) Hyatt responded that if Skopbank did not withdraw the above statement, it would "regard the Guaranty as repudiated and [would] exercise whatever remedies" it deemed appropriate. (Ex. 54 to Alibhai Declaration.)

It is unclear whether either party acted as if the Guaranty was repudiated after the July 29, 1992, Skopbank letter. Hyatt took no legal action until filing suit after the termination letter of March 21, 1995. Indisputably, Hyatt requested $156,807 for renovation costs in November of 1992, which was not paid by Skopbank. It is unclear whether that was the first request made by Hyatt under the Guaranty after the "repudiation" letter. In April of 1993 Hyatt again requested that its renovation costs be reimbursed, which by now had grown to $190,241. The Guaranty expired by its own terms on April 30, 1993. Hyatt made several more requests for renovation expenses, the last request in December of 1993 for a total of $212,016 unpaid renovation costs.[26] Skopbank claims that

---

[24] These facts are gleaned from correspondence attached as exhibits 49 to 55 to the Alibhai Declaration.

[25] The record is unclear what exactly transpired after this. Apparently, the wire transfer company was unable to recover the funds improperly transferred to the old accounts. A lawsuit was filed by the wire transfer company to recover the money. Hyatt's counsel wrote counsel for Skopbank on July 29, 1992 that as to the wire transfer error, "as of this moment, the Hotel has not been damaged." (Ex. 54 to Alibhai Declaration).

[26] The successive requests can be found in the exhibits attached to the deposition of Delroy Wright on February 13, 1997 discussed at pages 333 to 337. (Tab 8 of Reply Appendix.)

"until November 1992, Skopbank had promptly paid all amounts that Hyatt had requested for renovations, without questions." (Reply at 64.) This is demonstrated by a memo from Delroy Wright, Hyatt's Controller, dated December 16, 1993 requesting $212,016 from Skopbank to pay for renovation expenses. An attached document shows $3,273,949 of "expendables" relating to the Renovation Program, of which $3,061,933 was funded, leaving a total of $212,016 unfunded. (Wright Dep. 2/13/97 at 335 and attached memorandum, Tab 8 of Reply Appendix.)

At the time the Guaranty expired on April 30, 1993, the total unfunded renovation request was for $196,241. (Reply at 65.) The only damage that could result from the unfunded request is if Hyatt was unable to pay these costs or if Hyatt had to pay for the unfunded costs out of its own pocket. Hyatt's controller at the time indicated in his deposition testimony that hotel operating funds were used to pay for the unfunded renovation expenses and that when Hyatt was not reimbursed by Skopbank the amount was simply charged against the owner's control account at the end of the year. (Reply 65-66; Wright Dep. 2/13/97 at 336-37.) Thus Hyatt suffered no damages as a result of the unfunded renovation request.

## III. Conclusion

This Court finds that as a matter of law Hyatt was not wrongfully terminated by 35 Acres because Hyatt was in breach of its obligation to remit payments of Base Debt to Skopbank. Hyatt's arguments why it was not obligated to make such payments are contradicted by the express terms of the relevant agreements. Moreover, Hyatt's obligations were not excused by the alleged conduct of Great Cruz and Skopbank concerning their respective duties under the March 1990 Agreements. Because Hyatt's management of the hotel was justifiably terminated under the provisions of the March 1990 agreements, Hyatt's claim that the termination constituted "bad faith" is without merit. Hyatt's claim for breach of the Guaranty also fails because there is no evidence

---

Only a little over $55,000 was spent on the renovation program between November of 1992 and December of 1993 because of disagreements between Hyatt and the Owner over the renovation program. (Reply at 64-65, Response 80-85.)

that such a breach caused any damages to Hyatt. Accordingly, Counts One, Three and Ten of Hyatt's Counterclaim are dismissed. All that remains are the claims of Skopbank, 35 Acres, 12 Acres and Benefori Oy against Hyatt. An appropriate order is attached.

ENTERED this 4th day of April, 1997.

## ORDER

For the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that plaintiffs' motion for partial summary judgment on Hyatt's counterclaims for breach of contract is GRANTED; and it is further

ORDERED that Hyatt's counterclaim is dismissed in its entirety; and it is further

ORDERED that the liability phase of the Skopbank Parties' contract claims against Hyatt will be tried to the Court sitting without a jury during the week of April 28, 1997.

ENTERED this 4th day of April, 1997.